ED ASHTON, Executor of the Estate of ANNA TENNYSON, Deceased, Respondent, v. GEORGE J. BUCHHOLZ, Appellant, No. 40952—221 S. W. (2d) 496.

Division One, June 13, 1949.

*Garrett & Ruark* and *Walter A. Raymond* for appellant.

*Frank J. O'Leary* and *Charles V. Garnett* for respondent.

CONKLING, J.—This appeal is from a judgment in an action for damages for alleged fraud and deceit. Tried to a jury plaintiff had judgment for $10,000 actual and $5,000 punitive damages. Defendant then appealed. After the appeal was lodged here the plaintiff, Anna Tennyson, died. Upon stipulation the cause was revived here in the name of her executor.

Stating the record facts most favorably to plaintiff it appears that in 1939, Mid-Continent Quicksilver Corporation (hereinafter called "Quicksilver") owned a certain cinnebar mine property of about 100 acres near Amity, Arkansas. Since 1935 "Quicksilver" had been in bankruptcy under Section 77-b. The trustee in bankruptcy was R. J. Soper. That company was heavily involved. Its $24,000 first mortgage was due and unpaid and its bonds in default. It had preferred and common stockholders, both preferred and common creditors with claims of over $100,000 and large unpaid administrative costs. Efforts at reorganization had not succeeded. On July 10, 1939 defendant, George J. Buchholz, of Kansas City, appellant (hereinafter called defendant), James F. Pigg and Joseph R. Roberts, the latter two then of Little Rock, Arkansas, entered into a contract with Soper. By that contract, as prospective purchasers they obtained the right to (and did) mine cinnebar (the mineral source of mercury) from the bankrupt's mine and operate its reduction plant for a stated period upon a royalty basis. Those three men had been dealing in securities many years. That contract recited that a tentative re-

organization plan had been agreed upon. That plan was not carried through, but during defendant's operation of the mine mercury valued at more than $25,000 was produced and sold.

On October 10, 1939, defendant, Pigg and Roberts organized Mid-Continent Mercury Producers, Inc., an Arkansas corporation (hereinafter called "Producers") with a capital of only $300. Defendant was President and Pigg was Vice-President of that corporation. Later a supplemental plan of reorganization of "Quicksilver" was proposed and was approved by the Federal Court on February 13, 1940. This plan required Mid-Continent Mercury Products, Inc., (hereinafter called "Products") (but which was not even organized by defendant, Pigg and Roberts until February 29, 1940) to deposit $10,000 with the Court by February 23, 1940, to pay attorneys' and trustees' fees, taxes, royalties, etc. Plaintiff was defendant's only prospective source to obtain that $10,000. That supplemental reorganization plan further required that within a stated time "Products" should issue a total of $50,000 of First Mortgage Bonds, sell a certain amount of its preferred stock, liquidate the heavy indebtedness of "Quicksilver" and buy up all of "Quicksilver's" preferred stock. That was never done.

Plaintiff's petition alleged that to induce plaintiff to lend defendant the needed $10,000 it was fraudulently represented to her that: (1) "Producers" then owned the mining ▬ property and equipment thereon, (2) the $10,000 was being borrowed to employ more men at the mine and purchase additional equipment to better operate the mine, (3) the 10,000 shares of common stock which defendant contracted to deliver to plaintiff as a security for the loan would be "of an issue of stock that was preceded by no other", and (4) the *only* obstacle to immediate issuance and delivery to plaintiff of certain stocks and bonds "as collateral security" for the loan to defendant was the as yet unsecured authority of the Arkansas State Securities Commission for their issuance.

From August to December, 1939, one Charles Weston of Kansas City was defendant's superintendent at the mine. Weston's wife had known plaintiff (who also lived in Kansas City) for over ten years. They were close friends. Unknown to plaintiff, in January, 1940 Pigg had agreed to pay Mrs. Weston ten per cent of whatever money was realized or borrowed from plaintiff in consideration for Mrs. Weston "bringing this party (plaintiff) to us". Part of that ten per cent was later paid Mrs. Weston.

Plaintiff, a widow then 64 years of age, possessed some means through inheritance. She had only fourth grade schooling and no business or legal experience whatever. Unknown to plaintiff, defendant arranged with Mrs. Weston to take plaintiff to view the mining property. Unknown to plaintiff, defendant gave Mrs. Weston the money to pay the expenses of the trip. Plaintiff testified that she and

Mrs. Weston intended to go to Hot Springs to take the baths and that she knew nothing of any intention to visit any mine until they arrived in Hot Springs. On the train Mrs. Weston met a Mr. A. C. Grant, who said his employer was interested in purchasing mercury. Mrs. Weston introduced plaintiff to Grant. Until plaintiff reached Arkansas on that trip she never heard of a mercury mine.

Unknown to plaintiff, defendant had arranged with Mrs. Weston and Pigg for Pigg to meet them upon their arrival in Little Rock. He did so, drove the two ladies and Grant to his hotel and registered for them. All visited awhile in plaintiff's room. The next day (Sunday, February 11, 1940) Pigg drove the two ladies to Hot Springs. There they stayed at the New Arlington Hotel. While the three were at dinner in Hot Springs it was suggested that all drive over to a mercury mine. Plaintiff had never seen one and agreed to go. The next day Pigg drove them to the mine near Amity, where they spent about four hours. While there plaintiff saw men mining cinnebar, watched the reduction process and saw mercury produced. She talked to defendant's engineer in charge of the processing who told her, "If we had some new equipment—I don't have anything down here to do with, but if we had some new equipment and could put more people to work we could get out plenty of mercury". No one mentioned "Mid-Continent Quicksilver Corporation", or bankruptcy. Plaintiff had never before heard of defendant but at the mine was told that Mr. Buchholz was President and Mr. Pigg was Vice-President "of the mine". When at the mine plaintiff did not at first know that she would be asked to loan money to any one, but Mrs. Weston there told her that defendant had investigated her "standing", knew she had money to invest and had sent her there to see if she "would be interested in the mine". Pigg there said, "We need some money . . . $2500 won't do us any good . . . We really do need $15,000 but $10,000 would put us over the top". He said they "needed more machinery" and "he wanted to put two more shifts of men on, eight hour shifts". But plaintiff was not there asked to loan any money.

That day Pigg drove plaintiff and Mrs. Weston from the mine back to Little Rock. On Monday morning Pigg took them to see his Little Rock attorney who said he knew very little about the mine; that mining was hazardous; and that those two fellows who were running the mine "were wonderful boys . . . very much interested in their investors". That attorney was working for defendant on the reorganization of "Quicksilver". Pigg drove plaintiff and Mrs. Weston back to Kansas City. He suggested that they drive through Hot Springs so plaintiff could talk to Mr. Grant at the Arlington Hotel. She talked to Grant about the mine in the hotel lobby. Grant said "They surely will have to have more equipment . . . it (the mine) might be a good investment for some one who could

afford to wait a long time for their money''. They arrived back in Kansas City Tuesday night, February 13.

Mrs. Weston and plaintiff each maintained separate homes in Kansas City. But upon their arrival in Kansas City Pigg suggested that they stay overnight at the Ambassador Hotel. He took them there, secured the rooms and later paid their bill. Plaintiff had never met defendant but shortly after their arrival Pigg brought defendant to her hotel room. After introductions defendant asked plaintiff, ''How did you like the looks of *our mine* down there''. Buchholz had ordered dinner at the Muehlebach Hotel and presently he took all there to have drinks and dinner.

For some days thereafter (until they had plaintiff's $10,000) defendant or Pigg (either or both) continued to pay plaintiff marked and close attention. On Wednesday, at the Ambassador Hotel, defendant and Pigg excluded Mrs. Weston from the conference and talked with plaintiff alone in Pigg's room. The possibilities of the mine were pictured. They said they ''needed some money *to* employ more men and get more equipment so they could get the ore out faster . . . $10,000 will put us over the top''. Defendant said he expected to purchase the Muehlebach Brewery with his profits from the mine. Plaintiff was asked to loan the $10,000. She advised she did not have $10,000 available and they asked ''if there wasn't some way I could get it''. Plaintiff said she had $5,000 in cash. They asked about her securities which could be put up as collateral to raise another $5,000. Plaintiff was taken to lunch and to her home. The next day in further conversation about it plaintiff said she would not make the loan until she saw her banker. Pigg took her there but remained outside. Upon telling Pigg her banker disapproved, Pigg said, ''bankers don't know anything about mines; all they know is banking business. . . . You don't know what a chance you are passing up unless you put your money in there . . . I will bet you a new dress against a new hat that by August we will all be paying dividends,'' etc.

Defendant and Pigg maintained almost daily contacts with plaintiff. The loan and the mine were discussed at length. At defendant's suggestion, Mrs. Weston moved into plaintiff's home. On February 19, defendant and Pigg went to plaintiff's home at her invitation for dinner. The next day plaintiff agreed to loan the $10,000 to defendant at six per cent interest. Mrs. Weston had told plaintiff it was ''a good proposition''.

On February 21, Pigg took plaintiff to the Kansas City office of another attorney of defendant. The defendant was there present. Plaintiff was told ''we are writing a contract for you about the mine''. During this nine day campaign to persuade plaintiff to make the loan Buchholz and Pigg continually spoke to plaintiff of the mine as ''*their* mine''. Defendant also called it ''*our* mine''. Buchholz and

304

Pigg were spoken of to plaintiff as the President and Vice-President "of the mine". Even in his testimony in court (in 1948) Pigg used the word "*our*" in referring to the mining property. Plaintiff understood defendant and Pigg were President and Vice-President and that they (or their company) owned the mercury mine. Plaintiff believed the representations, relied upon them and made the loan in reliance thereon. No mention had ever been made to plaintiff (or in her presence) of bankruptcy or the Quicksilver Corporation. It was some months after plaintiff loaned the money before Mrs. Weston even heard of the bankruptcy. The contract (filed here as an exhibit) was there prepared.

Plaintiff therein agreed to loan "Producers", defendant and Pigg the sum of $10,000. The latter three therein agreed to (and did) execute a note therefor as co-makers; to "deposit (with plaintiff) as collateral" $10,000 par value 5½% First Mortgage Bonds of "the new corporation" (the corporate name thereof not therein mentioned) and 10,000 shares of its common stock "as soon as issued and delivery can be made"; the bonds were to be surrendered by plaintiff upon payment of the note; the stock to be likewise surrendered unless plaintiff desired to purchase same for $10,000; ▮▮▮ and plaintiff was to be elected to the Board of Directors and one of three voting trustees. The note for $10,000, the contract and other papers were executed and delivered. Plaintiff delivered defendant $5,000 in currency, her note for $5,000 and securities upon which defendant later raised $5,000 more. After the contract was prepared defendant's attorney told plaintiff she could take it for examination to any lawyer she desired. She did not do so.

Plaintiff testified she was not told and no recital was made in the contract about the Quicksilver Corporation; or that that corporation actually owned the mining property subject to a $24,000 mortgage and heavy outstanding indebtedness long overdue; or that it was in bankruptcy; or that defendant, his associates or his corporation had only a temporary right of possession of the mining property; or that defendant had to pay $10,000 by February 23; or that that $10,000 would be forfeited if defendant failed to also discharge the large debts of "Quicksilver"; or that defendant had no means whatever with which to pay such debts. Promises were made plaintiff in the contract respecting the deposit of $10,000 in bonds and $10,000 in common stocks in a then non-existent corporation "as collateral to guarantee the payment of said note". By the contract plaintiff was promised a membership on the Board of Directors and a membership in a voting trust of a then non-existent corporation. Plaintiff did not know what a Board of Directors was. The document was couched in legal language. At the time of the contract with plaintiff all defendant had was a mere contractual right of possession of the mine. When asked why his contract with plaintiff did not show the common stock to be

later issued would be subject to preferred stock and that the issuance of any securities would be subject to payment by "Products" of "Quicksilver's" debts and to compliance with all provisions of the reorganization plan, defendant merely replied he did not "draw the contract" and could not answer.

On February 22 (the next day) Pigg took $10,000 to Wichita and deposited it with the bankruptcy court to meet the requirements of the court order that "Products" deposit $10,000 by February 23. The money plaintiff loaned defendant was not used "to employ more men and get more equipment" for the mine. The supplemental plan of reorganization of "Quicksilver" was not consummated. The securities agreed to be delivered to plaintiff were never even issued. By June, 1941, defendant and others associated with him had lost all they had put into the venture. Plaintiff lost all she loaned defendant. Upon the trial Pigg testified that even the corporate books had been lost. Neither of defendant's attorneys testified.

Defendant first contends the petition states only legal conclusions and fails to state a cause of action upon which relief may be granted. For reasons hereinafter apparent it is necessary to here consider only the allegations set out as (1) and (2) in paragraph 4 of this opinion. As there stated in order to induce plaintiff to make him a loan of $10,000 defendant fraudulently represented that (1) "Producers" was the owner of a certain mine, and that (2) the $10,000 was to be used to employ additional men and to purchase additional equipment to develop the mine. This attack on the petition comes after verdict. Under these circumstances even a defectively stated cause of action in a fraud case is held not to be subject to attack.

We have considered the cases cited by defendant but they are not controlling here. In fact, we fail to see how plaintiff could have pleaded the facts in more detail unless she had pleaded her evidence. That the law does not require. We regard these allegations as sufficient under these circumstances. Courts are liberal in construction of pleadings after verdict where by reasonable intendment and fair implication essential fact allegations are present even by inference. But resort need not here be made to that rule. This pleading literally avers fraud and sets out the facts upon which such averment is based. Finley v. Williams, 325 Mo. 688, 29 S. W. (2d) 103, Burneson v. Zumwalt Co., 349 Mo. 94, 159 S. W. (2d) 605, State ex rel. Metropolitan Life Ins. Co. v. Allen, 310 Mo. 378, 276 S. W. 877. The contention is without merit.

It is next contended that the trial court erred in failing to sustain defendant's motion for a directed verdict at the close of all the evidence because there was no substantial evidence to support the fraudulent representations alleged. Plaintiff urges, however, that we cannot consider that contention suggesting that that motion fails to comply with Mo. R. S. A. § 847.122 and make known to the court "his

grounds therefor'' as therein required. We considered this question in Oganaso v. Mellow, 356 Mo. 228, 201 S. W. (2d) 365. Concluding that here defendant's motion in any event was properly ruled by the trial court, recognizing that confidence in the bar and the courts is promoted when causes are ruled on their merits instead of technicalities and ascertaining from the record before us that both the motion in question and the motion for new trial were heard and considered in detail and at length by the trial judge, we believe the interests of justice require our ruling on the merits of the case made by plaintiff. Statutes are enacted and rules of court promulgated for guidance and uniformity. They are to be meticulously observed. We will not hesitate when the occasion arises to rule such a motion deficient where the ''grounds therefor'' appear not to have had the consideration of the trial court on the bases later urged here. We will therefore consider the sufficiency of the evidence.

Upon this appeal defendant has also raised questions as to the propriety of plaintiff's given instructions. But plaintiff urges that we cannot consider them contending that the defendant in fact did not object thereto. However, defendant's objections to plaintiff's instructions appear in the transcript which was certified by the trial judge to be correct, ''including the Bill of Exceptions taken and saved on behalf of the defendant herein'' and, as so certified, the transcript was signed by the trial judge, and filed here. The fatal weakness of plaintiff's contention made here is that defendant's objections to plaintiff's instructions affirmatively appear in the transcript. We cannot go behind the showing of the transcript. The statute (Laws Mo. 1947, Vol. II, p. 219, 220), provides that if the correctness of any transcript is disputed by a party, ''the transcript shall be settled and approved by the trial court''. When it is so settled and approved, and it was here, we are bound by the transcript as settled and approved. Plaintiff's contention must be overruled.

We come now to the merits. The picture here is shown by the facts above stated. They need not be restated or elaborated. Defendant urges ''there was no proof of any positive misrepresentation, and concealment active or passive'' fails to make plaintiff's case. We concede the allegations were those of affirmative fraudulent representation. But we hold that representations (1) and (2), as stated in paragraph 4 supra, were supported by affirmative record evidence. We consider them in order.

The evidence is sufficient and substantial that defendant, and Pigg, as defendant's agent, fraudulently represented to plaintiff that ''Producers'' owned the mine and the equipment thereon. This situation is similar to that in Jeck v. O'Meara, 343 Mo. 559, 122 S. W. (2d) 897. The representations there were as to solvency of Lindell in which plaintiff was induced to invest. Defendant was an executive of another and a solvent corporation. In negotiations with plaintiff

as to the latter's investment in Lindell defendant used language leading plaintiff to believe he referred to Lindell. We there said: "The numerous *ours* and *we's* above italicized clearly indicate O'Meara spoke at the conferences as though he was *one of the owners* of the stock of the Lindell Chevrolet Company, or was authorized to speak for the owners of such stock and for the company". In the instant case defendant and Pigg were repeatedly spoken of to plaintiff as the President and Vice-President "of the mine". They were neither President and Vice-President of any mine, nor of any corporation which had any authority over the mine. By contract defendant, Pigg and Roberts, personally, had a right to operate the mine for a limited time. When plaintiff was at the mine no *corporation* had a right to do so. By the order of February 13 "Products" which had no corporate existence until February 29) was given authority to take certain steps looking to reorganization. "Producers", the ▮▮▮ only corporation of which defendant and Pigg were ever President and Vice-President until after February 29, had no authority to do anything with respect to the mine. By the reorganization plan "Producers" was not even recognized and acquired no rights whatever. But knowing the facts above defendant and Pigg referred to the mine as "their mine". Defendant asked plaintiff how she liked "our mine". Defendant and Pigg had no mine. They had no title to the mine. It stands conceded they had only a temporary right of possession and knew that neither they nor any corporation with which they were connected had any title.

While fraud is never to be presumed, it may be established by circumstantial as well as by direct evidence. Misstatements of fact calculated to deceive, fraudulent representations, lack of candor with an ignorant old lady, contradictions, failure to tell plaintiff such important things as that the title was not in "Products" but was in fact in a bankrupt foreign corporation are here present in such combination as to clearly justify the submission to the jury as to fraudulent representation as to title.

▮▮ Defendant next contends there was no representation that the $10,000 borrowed from plaintiff would be used "to employ additional men and to purchase additional equipment for development of the mine". We cannot agree. It is here argued that plaintiff's story is incredible and that we ought not to accept it. That argument should have been addressed to the jury. But the contention answers itself in the facts. There is ample evidence in the record that when defendant and Pigg were urging plaintiff to make this $10,000 loan, and, no doubt, were their most entertaining and persuasive, they repeatedly represented to plaintiff that the *basic and only* reason they had to have the money was to employ more men and purchase equipment at the mine. No other reason was ever given plaintiff of any need for money. They said, "We need more money *so* we can get the ore out faster".

As represented to plaintiff the need for money was confined to men and equipment only. No other need for money was mentioned. It is conceded that the money was not used for that purpose but that the next day the money was paid into the bankruptcy court. The testimony is substantial and is sufficient to warrant the submission to the jury as to this alleged representation.

There was substantial proof of alleged fraudulent representations (1) and (2) as set out in paragraph 4 of this opinion, to warrant the submission of plaintiff's case to the jury and that proof will support a judgment in her favor. The motion for a directed verdict, therefore, was correctly ruled. But plaintiff's instruction 1 submitted all four of the alleged false representations set out in paragraph 4 above in the disjunctive and alternative by the use of the word *or*. It is therefore necessary that record evidence support all four such allegations and submissions. Carlisle v. Tilghmon, (Mo.) 159 S. W. (2d) 663, and cases cited.

We proceed, therefore, to the inquiry whether there is substantial evidence of representations (3) and (4) set out in paragraph 4 of this opinion. Under the contract with plaintiff defendant agreed to deliver $10,000 in bonds and $10,000 in common stock to her "as collateral to guarantee the payment of said note". And the supplemental reorganization plan required the further payment by defendant of large sums (which this record shows defendant did not have and could not get) to discharge "Quicksilver's" debts before any bonds or preferred· stock or common stock could even be issued. This record shows defendant well knew all those facts, but we find no evidence at all of representations (3) and (4) having been made to plaintiff. There is proof and inference from the facts in this record that defendant and his contract with plaintiff concealed much that should have been disclosed to her. The defendant clearly desired plaintiff to believe that the securities to be delivered to her would be "preceded by no other", and also that there was no condition precedent at all to that delivery except securing the permission of the State of Arkansas to issue them. That plaintiff did so believe is too plain for words. But there is no evidence at all of any *representations* to that effect. There was only ▆▆▆▆ inexcusable concealment, candidly admitted and properly inferable. Concealment was not pleaded and in this case concealment cannot be substituted for evidence of the affirmative false representations alleged and submitted. Williams v. Hall, 207 Mo. App. 432, 230 S. W. 126, and cases there cited.

Any inference which may be drawn from the fact that under these concealment circumstances defendant and his associates permitted an inexperienced and unlearned widow 64 years of age and without legal advice, to execute a contract golden with promises and replete with such legal verbiage as bonds, common stocks, nominee, collateral, Securities Commission, controlling interest, corporations, voting trust

agreement, outstanding stock, Board of Directors, voting trustees, etc., cannot take the place of substantial evidence of such affirmative fraudulent representations (3) and (4) as were submitted here by instruction 1. It is evident from a reading of plaintiff's testimony that she had no understanding whatever of the meaning or implications of the contract. She was not even advised of the existence of the "Quicksilver" Corporation, or that it owned the mine and was bankrupt, or that defendant or his corporation had to (but could not) discharge "Quicksilver's" debts before any stock or bonds could be issued.

Plaintiff's instruction 1, therefore, was reversibly erroneous for including therein and submitting to the jury the alleged fraudulent representations (3) and (4). Under the submission as made in that instruction, there being no evidence to support representations (3) and (4), the judgment below must be reversed and remanded for retrial.

█ Under the circumstances appearing here defendant urges upon us that plaintiff "was guilty of such negligence in looking after her own interests as to bar any recovery herein". We do not agree. In Orlann v. Laederich, 338 Mo. 783, 92 S. W. (2d) 190 and McCaw v. O'Malley, 298 Mo. 401, 249 S. W. 41, cited by defendant, the representations were as to value and opportunity was afforded and investigation made. It may be conceded plaintiff did not approach the problem of loaning her money as a lawyer or banker would have approached it, and did not demand title research and other proofs. But the flattery of defendant's assiduous attention and the whirlwind campaign he made to secure and close the loan were disarming to one in plaintiff's position. She had been wined and dined for some days. In view of all the instant circumstances, the care used by defendant to have plaintiff view the physical property before seeking the loan from her, and the concealment of so many material facts in his nine-day campaign to secure this loan, we consider that plaintiff was not negligent in that respect and so rule.

█ It is also urged that a representation that the loan "was for the purpose of employing additional men and purchasing additional equipment" cannot legally be actionable because promissory in nature and falls within the rule of such cases as Grand Lodge of United Brothers of Friendship and Sisters of Mysterious Ten v. Massachusetts Bonding and Insurance Co., 324 Mo. 938, 25 S. W. (2d) 783. But a false representation of an existing purpose is a representation of a material fact and is actionable. There was evidence here of representation that defendant had a then existing purpose and intention to use the $10,000 to employ additional men and purchase additional equipment. A state of mind or an existing purpose may be misrepresented, and constitute a misrepresentation of fact. See Thieman v. Thieman, (Mo.) 218 S. W. (2d) 580, 585, Metropolitan Paving Co. v.

Brown-Crummer Inv. Co., 309 Mo. 638, 274 S. W. 815, 823, Collins v. Lindsay, (Mo. Sup.) 25 S. W. (2d) 84, 90.. The defendant's contention is without merit.

Complaint is also made of the giving of instruction 2. In substance it told the jury if the jury found that defendant knew that plaintiff reposed trust in Mrs. Weston; that the latter was employed to assist in obtaining the loan; that defendant. *and Mrs. Weston* concealed from plaintiff that Mrs. Weston was so employed; that because of *such deception of* ▆▆▆ *Mrs. Weston* and defendant plaintiff believed the representations made to her; that plaintiff by reason of *such deception* (by Mrs. Weston) and defendant was induced to make the loan; that, under those circumstances defendant could not rely upon the fact that plaintiff made no investigation of the truthfulness of the representations made to her.

We agree that the giving of the instruction was reversible error. It injected an issue which was wholly foreign to any raised by the pleadings or the evidence. There was no question in the case by pleading or proof of plaintiff's failure to investigate. The single charge of the petition was that defendant made certain fraudulent representations. The answer, filed in 1942, was a general denial. The range of the evidence did not go so wide as to bring into question any failure of plaintiff to investigate the truth of the representations. The instruction injects that wholly foreign issue. It is further noted that under instruction 2 the plaintiff is to be excused from any duty of investigation if the jury found that Mrs. Weston's deception induced the making of the loan. Defendant, and not Mrs. Weston, was charged in the petition as the wrongdoer. But the instruction injects Mrs. Weston as a co-conspirator and thus broadens the issues made by the pleadings. While instruction D, given for defendant, in stating the legal elements of this character of cause of action required a finding that plaintiff's reliance on defendant's representations was "the act of an ordinarily prudent person" instruction D did not warrant the giving of instruction 2.

It is our view that the instruction was confusing to the jury, injected foreign issues, was outside the pleadings and proof in the case, and singled out for improper emphasis the testimony of Mrs. Weston. In view of our ruling above, such an instruction has no place in the case.

The judgment appealed from is reversed and the cause is remanded for retrial. It is so ordered. All concur.