LILLIAN M. JOHNSON, Respondent, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant, No. 41863—237 S. W. (2d) 136.

Division Two, February 12, 1951.

Motion for Rehearing or to Transfer to Banc Overruled, March 12, 1951.

*Mattingly, Boas & Richards* and *Lloyd E. Boas* for appellant.

846

*Everett Hullverson* for respondent; *Orville Richardson* of counsel.

848

[137] ELLISON, P. J.—The defendant Public Service Company appeals from a judgment for $15,000 in favor of the plaintiff-respondent in her action for damages brought under Sec. 3653, R. S. 1939, Mo. R. S. A., and Sec. 3654, Laws Mo. 1945, p. 846, for the wrongful

death of her husband in a collision between a St. Louis Fire Department automobile in which he was riding [hereinafter called the "fire car"] and one of appellant's motor passenger busses, at the intersection of Twelfth and Market Streets in St. Louis, about 11 a. m. on Sunday, October 19, 1947. The verdict and judgment were for the full amount allowed by the statute, Sec. 3654, supra.

The errors assigned are that: (1) the trial court improperly overruled appellant's motions for a directed verdict, because respondent's decedent was guilty of contributory negligence as a matter of law, and the evidence was insufficient to make a submissible case under the humanitarian doctrine; (2) the court erred in giving three instructions requested by respondent, and in refusing one requested by appellant; (3) and the court unduly limited the closing argument of appellant's counsel.

The chauffeur of the fire car, John Frandeka, also brought a suit against appellant for his injuries in the same collision on the same grounds, primary and humanitarian negligence. The trial court refused to submit the humanitarian issue but Frandeka recovered a judgment on primary negligence. This court recently reversed that judgment on the theory that Frandeka was guilty of contributory negligence as a matter of law. But the cause was remanded on the theory he might make a submissible case under the humanitarian doctrine. The case, Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 SW. (2d) 540.

Getting back to the facts here. Respondent's deceased husband was a Battalion Chief of the St. Louis Fire Department, and in response to a fire alarm would go to fires within his district in a Department fire car, which in this instance was a Ford automobile of distinctive red color, equipped with a radio and loud siren. On this occasion he and his chauffeur, Frandeka, a substitute driver, were returning from a non-fire mission to the City Hospital, when an alarm was received on the radio in the fire car. Frandeka testified it said "alarm sounding," and gave an address on Olive Street. He asked the Chief "If that's us," and the Chief replied "Yes, that's us; let's go." They drove to Twelfth Street and thence proceeded north thereon at high speed for two or three blocks to the scene of the instant casualty at the Market Street intersection.

Twelfth Street extends north and south and is 110 feet wide, with parallel streetcar tracks occupying a 15 foot strip in the middle. Market Street runs east and west and is 76 feet wide. There are electric traffic signals on all four corners of the intersection, the lights of which change in sequence from red to left turn to green to amber. It is in a legally designated "congested area" of the city, with the Federal Building on one corner, the Civil Courts Building on another, the City Hall on the third, and the Plaza extending west along the north side of Market Street from the fourth corner. Two of appel-

lant's passenger bus lines traverse the intersection. One called the Lindenwood bus follows Market Street both east and west across Twelfth on the green light. The **[138]** other, called the Gravois bus, travels west on Market Street to the intersection and makes a left turn south onto Twelfth on the appropriate electric signal.

Very shortly before the casualty, according to the testimony of appellant's witness Virgil Allen, driver of the westbound Gravois bus on Market Street, he stopped at the southeast corner of the Market-Twelfth Street intersection east of the crosswalk just as the green light went on. He had to wait until it changed to left turn before he could proceed southward on Twelfth. As he stopped he heard a siren sounded. Looking south he saw the fire car coming north on Twelfth Street about even with the "south drive" of the City Hall on the southwest corner of the intersection. It was traveling about on the southbound (west) streetcar track on Twelfth, at a speed of 65-70 miles per hour according to his estimate. The witness did not see a Lindenwood bus behind him until it had passed his bus and got out in the middle of the streetcar tracks on Twelfth. The fire car by that time had reached the east-west crosswalk over Twelfth, and struck the bus about the middle at the side door.

Appellant's witness Donald Thompson, driver of the westbound Lindenwood bus just mentioned, testified he was traveling about 50 feet behind and to the right of the Gravois bus, about 8 feet from the curb. Seeing the traffic light was green he proceeded west across Twelfth Street at about 15 miles per hour without slowing up or stopping. He heard no fire siren until he was on the streetcar tracks in front of the fire car. He had therefore traveled about 55 feet [½ of 110 feet] from the east side of the intersection. Then he heard a woman passenger scream and when he glanced to his left he saw for the first time the fire car about 75 feet south of the south curb of Market Street. He heard no siren except a low moan the very instant before the fire car crashed against the middle side of his bus. He estimated the fire car speed at 55-60 miles per hour.

On cross-examination he said he looked south down Twelfth Street after passing the standing Gravois bus and before crossing the adjacent north and south crosswalk, but neither saw nor heard the fire car. He could see over the top of automobiles parked along Twelfth. Later he said he looked south when he reached the north and south curb line about 16 feet further west, and could see south on Twelfth Street for half a block. But still later he said he looked south only one time, before he heard his woman passenger scream and first saw the fire car. He did not stop, slacken speed, swerve or signal with his horn at any time.

Witness Thompson did not state the distance in which he could stop the bus at the 15 mile speed he was traveling. He admitted he told the police he could have stopped it in ten feet. But on the

stand he denied the accuracy of that estimate. As to effective re-action time he said "it takes just long enough to take your foot off the gas." He thought this would be about a second. The Frandeka opinion, supra, states he said there that at 15 miles per hour he could have stopped the bus in 23 to 25 feet. As to the distance in which he did stop he testified in this case that the *back* end of the bus [which was 33 feet long] was even with the west curb line of Twelfth Street when it came to rest. When the collision occurred it was astride the mid-line of Twelfth Street, 55 feet east of the west line thereof and 39 feet east of the west curb line, which latter was 16 feet out in the street. Since the bus was astride the mid-line, one-half its length or about 16-½ feet projected into the 39 foot distance to the west curb. In other words, the *front* of the bus was 39 feet minus 16-½ feet, or 22-½ feet from the west curb when the collision occurred, and the *rear* of the bus was even with that curb line when it came to rest. The bus therefore traveled 22-½ feet, plus its length, 33 feet, or 55-½ feet after the collision. The fire car was turned clear around and faced south.

The above two bus drivers were the main witnesses for appellant as to the immediate facts leading up to and at the time of the collision. Plaintiff-respondent's main witness on those facts was Frandeka, the driver of the fire car. He said that as **[139]** he proceeded north on Twelfth Street and approached Market Street he was traveling about in the middle of Twelfth Street at a speed of 50-55 miles per hour, and was sounding his siren constantly over a distance of about two blocks. When he was about a half-block from Market Street he noted the automobiles on the street had been stopped on the sides, and he continued on until within about 20 feet of the south line of Market Street when the Lindenwood bus suddenly shot out in front of him without warning or slackening speed. He put on his brakes and tried to swerve, but could not avert the collision. The fire car hit the bus on the side a little off the center. At the speed he had been traveling he thought he could have stopped in 140-160 feet.

On cross-examination Frandeka said he imagined he could have slowed down to 15 miles per hour in about 115 feet, and could have stopped in about 140 feet. He said he did not look to see whether the electric traffic signal was in his favor, and did not slow down any time before he saw Thompson's bus. When he was 150 feet south of the Market Street intersection he saw the whole intersection and there were no cars in it that had not stopped. It was shown that in a previous deposition he had said when he did see the Thompson bus he was unable to tell whether it was moving or stopped. And it was further shown that at the previous trial he had stated he never saw the bus until it was in the center of the street on the streetcar tracks.

A number of eyewitnesses called by one or the other of the parties severally estimated the speed of the fire car at or between 50-60 miles per hour. Only the appellant's Gravois bus driver Allen extended it to 70 miles. The speed in miles per hour of the Lindenwood bus that was struck was variously estimated by the witnesses at: a little over 4-5 by one; by others at 10-12; 12-15; 15 by Thompson, the driver of that bus; 15-20 by one witness; and 25 by another. The highest speed estimate in the Frandeka case was 20 miles. Of these witnesses and others, five were passengers on the Lindenwood bus, three seated on the north side and two on the south side from which the fire car was approaching. One of the latter was talking to the bus driver and another passenger. None of these heard the fire car siren except one passenger who heard a screaming noise just before the crash but couldn't tell whether it was a siren. Another heard someone "holler". And as the bus driver testified a woman passenger did scream.

There were also a number of witnesses who were either pedestrians or in other near-by motor vehicles that stopped after hearing the siren of the fire car. And there were several firemen at a fire station three blocks south on Twelfth. From the testimony of these a jury could well have found that the fire car was going north at high speed in about the middle of Twelfth Street with the siren sounding constantly. It did not slow up for the traffic signal at the Market Street intersection which was against it, until some part of the Lindenwood westbound bus was in front of it. Then the fire car attempted to stop and swerve but could not avert the collision.

As to the distance of the fire car from the Lindenwood bus and the possibility of averting the collision at this critical time. It will be remembered, appellant's witness Thompson testified his bus was in the middle of the intersection when he first saw the fire car 75 feet south of the south curb of Market Street. Respondent's witness Zalot, a pedestrian, gave the same distance and also said the fire car began to slow down at that time. He further stated Thompson's bus was traveling about on the middle line of Market Street, which was 76 feet wide. One half its width, 38 feet, added to the 75 feet would make 113 feet, and place the fire car about that far away then. And if Thompson had seen the fire car sooner after emerging into Twelfth Street it would have been still further south. He said if he had seen it he would not have entered the intersection. And also the fire car made a belated effort to slow down. Witness Frandeka testified he thought he could have slowed down to 15 miles per hour in 115 feet and stopped in about 140 feet.

[140] Another witness, called by respondent as an expert on the stopping distance of the Lindenwood bus, was Carrol Pratt, a former bus driver for the Public Service Company discharged for colliding with a parked truck which, he said, suddenly started out from the

curb in front of him. He testified a bus of the type involved here, with half a load of passengers [as this one was], could be stopped in about 18 feet when going 15 miles per hour. When traveling 4-5 miles per hour, as the witness estimated, he thought the stopping distance would not be over five feet. He said the Company rules required a bus driver entering an intersection to have his foot on the brake in readiness to stop.

On cross-examination he said the turning radius of the busses was ''sharp''. But he agreed the stopping distances he had given were figured from the time the brakes took hold, and did not include the driver's reaction time. He conceded this latter, at 15 miles per hour measured in feet, might be 16 or 17, making the total stopping distance 36 feet after he saw the danger. On re-direct examination he said that with reaction time included if the driver had his foot on the brake pedal as the Company rule required, he thought the stopping distance would be 20 feet. And of course it is apparent that if the bus speed was under 15 miles per hour, such as 10 or 12 miles or less, the stopping distance would be decreased still more, depending on the alertness of the driver.

We are constrained to uphold appellant's first assignment of error—that respondent's decedent, Battalion Fire Chief Johnson, was guilty of contributory negligence as a matter of law. The facts here are substantially the same as those recited in the Frandeka opinion, and he was responsible for the actions of his subordinate and driver. We shall not extend the opinion by further discussion of this issue.

On appellant's second assignment, that respondent's evidence was insufficient to make a submissible case under our humanitarian doctrine. The respondent's petition in this case alleged that the appellant's bus driver Thompson in the exercise of the highest degree of care would have seen the fire car approaching and in imminent danger of collision with the bus, in time: ''to have stopped said bus, slackened the speed thereon, or swerved the same,'' and then to have averted the collision. These same three issues were similarly submitted in the respondent's instruction No. 3. And it is held that when multiple charges of humanitarian negligence are thus submitted by instructions in the disjunctive, it is incumbent on the plaintiff to make a prima facie evidentiary showing on all of them. Ayres v. Key, 359 Mo. 341, 349 (1), 221 SW. (2d) 719, 722 (1); Harrell v. Berberich, 359 Mo. 551, 555 (1), 222 SW. (2d) 733, 735 (2); Ashton v. Buchholz, 359 Mo. 296, 308 (6), 221 SW. (2d) 496, 502 (1) [a fraud case]; Yates v. Manchester, 358 Mo. 894, 898-9 (1), 217 SW. (2d) 541, 542 (1); Carlisle v. Tilghmon (Mo. Div. 2) 159 SW. (2d) 663, 665 (4); Dilallo v. Lynch, 340 Mo. 82, 89 (4), 101 SW. (2d) 7, 11 (7).

Under these decisions respondent was duty bound to make a prima facie case for the jury on all three issues. Did she do so when

854

the facts are viewed in the light of the credible evidence most favorable to her, as it is our duty to do? Considering first the issue of stopping. The fire car was going north on Twelfth Street at a speed of 50 miles per hour and according to some witnesses was traveling along the southbound streetcar track which was on the west side of the middle line of the street, and therefore over 55 feet west of the east line of the street. The Lindenwood bus entered into and moved across Twelfth Street at a speed of 10-12 miles per hour—even if we disregard the testimony of respondent's soldier witness Zalot that it was going 4-5 miles per hour.

The bus driver, Thompson, admitted he told the police he could have stopped the bus in 10 feet, but on the stand denied the accuracy of that estimate and gave no other speed. Respondent's expert witness Pratt said the bus, traveling 15 miles per hour, could have been stopped in about 18 feet. After making allowances on cross and re-direct examination for reaction time, and the duty of the bus driver to have his [141] foot on the brake as the Company rules required, the witness gave the stopping distance as 20 feet. And obviously if the bus speed was only 10-12 miles per hour or less, the stopping distance would be still less. The fire car then was about 113 feet south of the bus and was coming on at undiminished speed. Frandeka, driver of the fire car, said he was within 20 feet of the south line of Market Street, or 58 feet from the middle line when the Lindenwood bus came in front of him. The driver of the Gravois bus said that as he stopped on Market Street at the Twelfth Street line, he heard the fire car siren and saw it approaching from the "south drive" of the City Hall located at the southwest corner of the intersection. From this the jury could infer the same was true of the Lindenwood bus driver before he came into the danger zone. Under this evidence we think the jury reasonably could find the bus could have been stopped before the collision. And if that could have been done, it could have slowed up and swerved in less time, as is conceded in the Frandeka case, supra. This was enough to make a prima facie case of humanitarian negligence.

But it does not follow from this that the judgment below should be affirmed. We have already held the respondent's decedent was guilty of contributory negligence as a matter of law. And that being true respondent's claim that appellant was guilty of primary negligence is nullified, even if well founded. This leaves her case standing on her assignment of humanitarian negligence. But the jury's verdict for her was a general verdict, and does not disclose whether it was based on that claim or on her unfounded claim of primary negligence. Hence, under the group of six cases cited in the fourth preceding paragraph the verdict cannot stand.

Appellant's third assignment complains of error in the giving of respondent's requested instruction No. 6, which read as follows:

"With reference to the defense of contributory negligence, the Court instructs the jury that the burden is not upon the plaintiff to establish that at the time of the casualty mentioned in evidence her husband, Chief Johnson, was not guilty of contributory negligence but, on the other hand, that burden is upon the defendant." The error may not recur on another trial, and is immaterial in this case because we have already ruled as a matter of law that the respondent's decedent was guilty of contributory negligence. But we pass on the assignment briefly.

The complaint made is that the instruction required appellant to "establish" that respondent's decedent was guilty of contributory negligence. Appellant asserts the use of that word placed a greater burden on it than the law requires, citing State v. Davis, 342 Mo. 594, 598-9 (2), 116 SW. (2d) 110, 112 (5), a criminal case. That decision was distinguished in Morris v. E. I. DuPont De Nemours and Co., 351 Mo. 479, 486 (4), 173 SW. (2d) 39, 43 (12) and other cases cited therein. In substance these decisions held the use of the word "establish" in the State's instructions in a criminal case is more prejudicial than in a civil case, because in the former the burden is on the State throughout to establish the defendant's guilt beyond a reasonable doubt. Also in the Morris and other cases the word "establish" was qualified by such expressions as that the evidence must "point to" the fact of negligence or that the evidence must "preponderate" on that issue, etc. The instruction in this case contains no such qualification, and in our opinion prudence would suggest that it should not be so used even in a civil case.

Appellant's fourth assignment is that the trial court erred in giving respondent's requested instruction No. 1, and in refusing to give appellant's requested instruction No. A in lieu thereof. Both these dealt with the right of the deceased fire chief Johnson and his driver Frandeka to disregard the red traffic stop signal on Twelfth Street at the Market Street intersection at the time of the collision. Summarized, respondent's given instruction No. 1 quoted a city ordinance defining "emergency vehicles" as being those used only by or in connection with the fire and police departments, and also ambulances used in hospital service of the city and vehicles of the underwriters' salvage corps. It provided [142] they should have a siren, and when the siren was sounded continuously they should have the right of way in any direction on any street, and might disregard automatic traffic signals when they were being driven in emergency service. It further provided the drivers and operators of other vehicles should, on the approach of such emergency vehicles, drive to the curb and stop, and streetcars should immediately stop and keep stationary.

Continuing, the instruction proceeded to tell the jury if they found from the evidence that the fire car here was an emergency fire

department vehicle in emergency service, or was so understood to be by the deceased Chief and his driver Frandeka [whether it was or not], and that its siren was being sounded continuously, then the fire car had the right to disregard the traffic signals at the Market Street intersection. And if the driver of the Lindenwood bus failed to stop at the curb and crossed the course of the fire car and caused the collision he violated the ordinance and was negligent. Concluding, the instruction told the jury if they found the deceased Fire Chief was injured and died as a direct result of the bus driver's negligence, if any, his widow, the respondent, was entitled to recover.

The appellant's tendered instruction A told the jury if they believed from the evidence that the alarm received over the fire car radio was not an alarm of fire, and that the deceased and Frandeka knew, or should have known it was not, then they had no right to operate the fire car in an emergency run and to disregard the traffic signals at the Market Street intersection.

In the Frandeka case the appellant cited twelve Missouri decisions which are listed in that opinion. It held they did not apply to the facts there. In its brief in this case appellant cites ten cases, no one of which was among the twelve cited in the Frandeka case. So far as the writer has found, the only evidence on whether the deceased Fire Chief and Frandeka thought they were going in emergency service was Frandeka's testimony about the reception of a broadcast through the fire car radio: "It said alarm sounding, I don't know the address was on Olive Street, and I asked him if that's us, and he said, 'Yes, that's us, let's go.'" This, it would seem, indicated the Chief thought the alarm was a fire alarm, that being the service he was in. And both instructions 1 and A under construction here, conceded that if he and Frandeka thought they were answering a fire alarm the ordinance would apply to them. But even so, this would not justify their contributory negligence in running into a vehicle they could see and avoid in the exercise of due care, as the Frandeka opinion holds.

Appellant's brief makes some complaints about the phraseology of the instruction and omissions of necessary recitals therein. We are not passing on these, as the case must be tried again and it can be recast in any necessary particulars, as counsel see fit. We are holding only that an instruction along the general lines of this one would be proper, assuming the evidence shows the deceased Fire Chief and Frandeka reasonably thought they were answering an emergency fire alarm.

The final assignment is that respondent's instruction No. 3 on humanitarian negligence was erroneous in predicating appellant's liability on the assumption that the fire car was *approaching* and in a position of imminent peril, which language was condemned in Buehler

v. Festus Mercantile Co., 343 Mo. 139, 159 (8), 119 SW. (2d) 961, 970 (12). That instruction may be modified on another trial.

For the reasons stated the judgment is reversed and the cause remanded. All concur.