Eugene ACKMANN and Melba L. Ackmann, Plaintiffs-Respondents,

v.

KEENEY–TOELLE REAL ESTATE COMPANY, Twillman Construction Company and Wilbert W. Twillman, Defendants-Appellants.

Nos. 51764, 51772.

Supreme Court of Missouri, En Banc.

April 11, 1966.

Edward F. Downey, John J. Delabar, Jack V. Hoskins, St. Louis, for respondents.

R. K. Schurr, Schurr & Inman, Clayton, for appellant Keeney-Toelle Real Estate Co.

Andrew H. McColloch, Wentker & McColloch, Robert V. Niedner and Niedner, Niedner & Moerschel, St. Charles, for appellants Twillman Const. Co. and Wilbert W. Twillman.

HYDE, Judge.

Action for damages for fraudulent misrepresentations in the sale of a home to plaintiffs, who had verdict for $3,000.00 actual damages and $10,500.00 punitive damages. After remittitur ordered was made, judgment was entered for plaintiffs for $1,500.00 actual damages and $3,500.00 punitive damages. Defendants appealed and contend the court erred in overruling their motions for directed verdicts at the close of all the evidence. The St. Louis Court of Appeals held the trial court correctly overruled these motions but reversed and remanded (because of error in giving Instruction No. 3) for a new trial on the issue of damages only. On application of defendants, we ordered the case transferred; and it is to be determined here "the same as on original appeal." Sec. 10, Art. V, Const., V.A.M.S.

Because of defendants' claim of error in overruling their motions for directed verdicts, it is necessary to make a full statement of facts and we adopt the following statement from the opinion of the Court of Appeals, without quotation marks, and with some additions. The construction company began work on "Harvest Acres" subdivision early in 1959. Keeney-Toelle was the sales agent. This subdivision was located in an unincorporated area in St. Charles County and water for it was to be supplied by the developer. Sec. 192.200, RSMo V.A.M.S., requires water suppliers to file plans "with a description of the methods of purification and of the source from which the supply of water is derived" and provides "no source of supply shall be used without a written permit of approval from the division of health." Section 3 and Section 5 of the regulations of the State Division of Health governing the installation and operation of public water supplies provide: "Sec. 3. SUBMISSION OF PLANS FOR NEW WATERWORKS— Every owner or his authorized agent, before installing or entering into a contract for installing a water supply or water purification plant, shall submit in duplicate to and receive the written approval of the Division of Health of complete plans and specifications fully describing such water supply or water purification plant, and thereafter such plans and specifications shall be substantially adhered to unless deviations are submitted to and receive the written approval of the Division of Health. * * * Sec. 5. FINAL APPROVAL— Every owner, before accepting or placing in operation a new water supply or water purification plant, or additions to, or changes or alterations in, any existing water supply or water purification plant, shall receive written final approval of the Division of Health stating that the completed work substantially adheres to the approved plans and specifications."

In July of 1959 Twillman furnished sales information to Keeney-Toelle. This information contained the words "water State approved." The advertisements placed by Keeney-Toelle by Twillman and by the construction company for the sale of houses in the subdivision contained that statement. In August, a month after advertisements containing this statement began to appear on billboards and in the

newspapers, Twillman first submitted to the Division of Health plans for a well to supply Harvest Acres. Twillman admitted that he did not have state approval of his water when he started placing the advertisements and when he gave information for the advertisements and that, at that date, he hadn't even begun the well. The Keeney-Toelle sales manager testified that the purpose of placing the ads was to get people to read them and rely upon them and that in fact people did rely on those advertisements and contact his salemen and buy houses. Later there were signs saying "gas, water, sewers, wide streets." In December of 1959 the plaintiffs became interested in a home in this subdivision. In looking for homes they had read the advertisements that the water was state approved. While they were considering buying a home in the subdivision, they looked at a display house used by Keeney-Toelle and while doing so, Twillman gave them a glass of drinking water. After drinking it in the presence of Twillman and a Keeney-Toelle salesman, the plaintiff said, "That's one thing we don't have to worry about. We have got good drinking water here." Twillman and the salesman made no comment although they knew the water that the plaintiff drank was hauled in from the City of St. Charles. The plaintiffs testified that they relied upon the statement in the advertisements that the water was state approved and would not have purchased a home otherwise. Plaintiffs were the fourth family to move into this subdivision.

Plaintiffs and their neighbors in the subdivision were experiencing the same hardships with the water, and their testimony was that the water was extremely salty, unfit for drinking, and with a smell like a bad egg. Some of the children in the neighborhood got diarrhea from the water. In the summer of 1960 following the plaintiffs' purchase of a home in this subdivision, the residents complained to the defendants concerning the quality and quantity of water. On July 20 of that year some water from well No. 1 was submitted to the state for analysis. The testimony was that all of the chemical components were "* * * within the acceptability of the United States Public Health Service standards" followed by the State Department of Health. However, its chloride content was high and accounted for its salty taste.

A sanitary engineer with the Missouri Division of Health, Robert S. Miller, testified by deposition that he was the assistant chief of water supply and that Twillman's plans and specifications for well No. 1 were approved on August 12, 1959 although no one wrote a formal approval. Formal written approval is required by the regulations, and he doesn't know why it was not done except that the Department was then experiencing a change of personnel. The requirements for submission and approval of plans for a well mainly are to require construction that will prevent surface contamination. The construction company drilled a second well in 1960 and chemical analysis on the water in this well showed that its mineral content was similar to well No. 1. By letter of February 7, 1961, Twillman was informed that his water system could not be approved due to the fact that no plans and specifications were submitted for well No. 2 or for the reservoir and also due to the fact that his chlorination system was , defective. In March of 1961 Twillman was informed by the State Department of Health that well No. 1 was acceptable for serving approximately twenty homes and stated that "* * because of the low yield of wells in this area and mineralization of the water, long range plans should be completed for a source of water supply of adequate quantity and quality." There were then forty-three finished houses in the subdivision of which thirty were occupied. As to well No. 2 Twillman was informed: "(2) Well No. 2 may be utilized as an emergency standby source of supply, providing chlorination and a two-hour detention time are provided. When not in service, the piping must be completely disconnected from the water

distribution system serving the subdivision. Approval for usage of this well as an emergency source of supply is given with the understanding that an additional properly constructed well is to be provided at an early date and this well will be abandoned when the new supply is available." The plans for the third well were approved in 1962 and the well was placed in service sometime prior to March of 1963. It produced a satisfactory water supply. Miller was asked if the water from these first wells was fit for human consumption. His answer was that the water " * * * wasn't a health hazard to the people consuming * * * " it. He further testified that " * * * I don't know what State approved water is" and that he could only judge water on the basis of whether it constituted a health hazard and that this was the extent of the function of his department of the Division of Health with regard to the approval of water. Miller's testimony also was that Dr. Hardwicke, head of the Department of Health of the State of Missouri, at a meeting with the people living in the subdivision, expressed the opinion the water would cause diarrhea but also " * * * expressed the opinion to these people it wasn't a health hazard. * * * " Defendants made an offer of proof that if permitted, Miller would testify that the United States Department of Health drinking water standards had two basic criteria; that the first of these concern chemical constituents which shall not be in the water. These are constituents which affect the health of people. The second of these are constituents which should not occur in the water. These do not affect the health of people but result in staining fixtures and other similar results.

With respect to the issue of damages, the transcript shows the plaintiffs pleaded that they " * * * have been induced to make promissory note whereby they have become indebted * * * " in the amount of .$30,000.00 (for principal and interest on a 30-year loan); that the " * * * bathroom, kitchen and utility appliances, fixtures and tile have been damaged and caused to depreciate in the approximate amount of $2,500.00" due to contact with the dangerous and harmful chemicals contained in said water; that from the date of purchase in April the plaintiffs have been required to haul safe and suitable water at an average weekly expense of $5.00; and that they had to purchase an auxiliary gas tank, "the reasonable market value" of which was $280.00. Their prayer was for actual damages in the amount of $15,000.00 and for punitive damages of $30,000.00. On the date the trial court ruled the motion for new trial it permitted plaintiffs to amend their petition by adding the following allegation of damage: "And by reason thereof the aforesaid realty had a value of about $3,000—less than the value of said realty if it were as represented, having State approved water."

The plaintiffs moved into their home in the middle of April 1960. They had trouble with the water in the subdivision until March of 1963 when the third well was put into service. The water supply was inadequate and often nonexistent as they were often out of water for as long as a week at a time. They stored water in a child's swimming pool and carried it into the house in buckets to use to flush their toilets. The water was dirty looking and turned their laundry brown. They had to replace the kitchen sink "fixtures," those in the bathroom lavatory, and also the "works inside the flushing tank." The basement fixtures were corroded at the date of trial but still usable. When they moved in plaintiffs owned an automatic washer with a "granite" tub. Within six months the salt in the water ate through it and dripped down onto the motor. The only testimony as to its value was that it had cost them $299.00. They replaced it with a new washing machine and "before long that went out." They replaced it with a "manual" washing machine. They also replaced the hot water heater. There was no evidence as to the value of these items.

In a hypothetical question the witness Roach was asked of the reasonable market value of the home on the date of purchase assuming the subdivision "* * * did not have State approved water and that in fact the water that was supplied there had a high iron content that would rust or give the laundry appearance, that would corrode fixtures and appliances, would cause diarrhea, would not be sufficient in quantity to do the laundry because of a high chloride content that was difficult if not impossible to get lather out of soap, and based upon the assumption that, for a period of time as long as seven days, there would not be sufficient water for the ordinary domestic uses, such as flushing toilets and washing and bathing * * *." His answer was, "You are asking for the market value of a piece of property which has no water * * * and as such there would be no value to it. It wouldn't be marketable at any price." He stated it would have a deficit value. The same witness placed a value of $12,500 to $13,000 on the property when asked to do so assuming it to have "State approved water in sufficient quantity and quality." Another witness stated that he felt the house plaintiffs purchased was then worth the $12,820.00 paid for it but refused to testify what it would be worth "* * * without water approved by the State," stating that "I don't know what it would be worth." At the date of trial the price on the sign at the entry to the subdivision was $11,900.00. It had been $12,640.00 when plaintiffs purchased in 1960. Twillman agreed that the price on the houses went down and stated that this resulted from the complaints the purchasers made about the water.

■ We conclude as did the Court of Appeals that plaintiff made a submissible case against all three defendants. We do not agree with defendants' view that their advertisments about water should be construed as prospective and not representations of existing facts. The cases cited are not in point. Bayer v. American Mutual Casualty Co., Mo.Sup., 359 S.W.2d 748 (where plaintiff did not rely on representation but made his own investigation) and Powers v. Shore, Mo.Sup., 248 S.W.2d 1 (where proof did not show representations false when made). Our view is that the jury could reasonably find from the positive statements on billboard and newspaper advertising that the statements about water were statements of present conditions; and that they meant an adequate supply of usable water.

■ As to defendants Twillman and Twillman Construction Company, we adopt the following ruling of the Court of Appeals: "Misrepresentations as to the permanency or sufficiency of the water supply available to a piece of real property when made as statements of fact and not as opinions may constitute fraud provided all the elements of fraud are present. 37 C.J.S., Fraud, Sec. 53, c. pp. 314–318. See Drew v. Christopher Construction Co., Ohio [140 Ohio St. 1], 41 N.E.2d 1018; Waters v. Novak, Ohio [94 Ohio App. 347], 115 N.E.2d 420; Rowell v. Jaris, Maine, 93 A.2d 485; Smith v. De Metre, Vt. [119 Vt. 73], 118 A. 2d 346; Clay v. Brand, Ark. [236 Ark. 236], 365 S.W.2d 256, and see the note in 174 A.L.R. 1010, dealing generally with fraudulent representations of vendors regarding the physical condition of real property. See also 37 C.J.S. 310, 316, Fraud, Sec. 53. In determining whether plaintiffs made a submissible case the evidence that bears upon the elements of fraud must be viewed in the light most favorable to the plaintiffs giving them the benefit of all reasonable inferences to be drawn therefrom. Wilson v. Murch, Mo.App., 354 S.W.2d 332. The elements of fraud are a representation; its falsity; its materiality; the speaker's knowledge of the falsity or his ignorance of its truth; the speaker's intent that his statement should be acted upon by the person and in the manner reasonably contemplated; the bearer's ignorance of the falsity of the statement; his reliance on its truth; his right to rely thereon; and his consequent and proximately caused injury. Swyden v. James H. Stanton Construction

Co., Mo.Sup., 336 S.W.2d 389, l. c. 392, quoting from Powers v. Shore, Mo.Sup., 248 S.W.2d 1. There was evidence from which the jury could have found each of these elements to be present. It is uncontradicted that the defendants represented this subdivision as having state approved water and that this representation was false at the time it was made and for approximately three years thereafter. The materiality of such a representation was never seriously contested as the necessity for water in sufficient quantity is obvious. Twillman admitted that he knew the statement to be false as he did not have state approval and had not even begun the first well when he furnished that information to Keeney-Toelle. It is not contested that his knowledge would bind the construction company of which he was president and principal shareholder."

 As to defendant Keeney-Toelle, we also find the evidence sufficient. Although the information about water for the subdivision was originally furnished to it by Twillman, its sales manager Allen, a vice president, arranged all the newspaper advertising, starting prior to construction of the houses. There was a display house on the premises which Keeney-Toelle kept open and sales were made there. Plaintiff's testimony showed that drinking water used at the display house was hauled from St. Charles and that Twillman and the Keeney-Toelle salesman there, when plaintiff was looking at the house, led him to believe it was the water furnished for the subdivision. Our view is that there at least was sufficient circumstantial evidence to support a finding that Keeney-Toelle knew about the water situation. Furthermore, as said in Wilson v. Murch, Mo.App., 354 S. W.2d 332, 338: "To recover for fraudulent representations, it is not necessary that it be shown that defendant had actual knowledge of the falsity of the facts stated by him. It is sufficient that he made the representations with the consciousness that he was without knowledge as to their truth or falsity, when, in fact, they were false."

 As to punitive damages, we find the evidence sufficient to authorize an award. As stated by the Court of Appeals: "In Brown v. Sloan's Moving & Storage Co., Mo.Sup., 296 S.W.2d 20, 26, it was held that ' * * * In this State, punitive damages may be awarded in a case of fraud and deceit where the representations are characterized by legal malice. In speaking of legal malice our courts have in mind "simply the accepted theory of the intentional doing of a wrongful act without just cause or excuse, and not the necessity for the showing of any spite or ill will, or that this particular act was willfully or wantonly done" (citing cases).' * * * The evidence the defendants placed these advertisements containing this misrepresentation when no well had even been started and indeed, the defendants' conduct throughout this affair, amply support the jury's finding the defendants' wrongful action, the misrepresentation, was an act without just cause or excuse." In the Brown case, defendant advertised a fireproof warehouse but put plaintiff's goods in another warehouse that was destroyed by fire. We said: "A jury could reasonably infer from defendant's advertisement and from the evidence that defendant's Hodiamont Avenue plant was not as stated in the advertisement, that the representations in the advertisement were made intentionally with the wrongful purpose of inducing the public, including plaintiff, to believe all of defendant's storage facilities were as stated in the advertisement, that is, that they were all fireproof and equipped with sprinkler systems." Likewise here a jury could reasonably find that from defendants' advertisements and the evidence that the water situation at the subdivision was not as stated in the advertisements and that the representations were made intentionally for the wrongful purpose of inducing the public, including plaintiffs, to believe that good and sufficient water was available for residence purposes.

However, defendants say: "The opinion, in ruling that nominal damages will support

an award in fraud and deceit, including punitive damages, is also in conflict with and fails to follow the last controlling decision of the Supreme Court in Lammers v. Greulich et al., 262 S.W.2d 861, 1. c. 864 (2) (3) (4) wherein this Court distinguished fraud and deceit cases where actual damages must be shown, from those cases where only nominal damages will support an award." What the Court of Appeals said about nominal damages is not necessary to the decision that the trial court correctly overruled defendants' motions for directed verdict. We find there was evidence of plaintiffs' actual damage, although perhaps not as much as the amount allowed in the judgment. The evidence showed a decrease in value of houses in the subdivision, the price of houses having been reduced from $12,640.00 paid by original purchasers to $11,900.00 before the time of the trial. There was also evidence of damage to fixtures and appliances and expenses of hauling water. Our view is that plaintiffs' evidence is sufficient to show actual damages on retrial.

■ Nevertheless, we consider retrial of this case should be on all issues and not limited to the amount of damages. One reason for this is that plaintiffs seek punitive damages and the amount of punitive damages depends on consideration of the merits of the case. Moreover, the amount of punitive damages could be different as to each defendant. See State ex rel. Hall v. Cook, Mo.Sup., 400 S.W.2d 39, decided March 14, 1966. We do not see how the jury could properly determine the amount of punitive damages without hearing the evidence on all issues. A further reason for requiring a new trial on all issues is that Instruction No. 2 given at plaintiffs' request and authorizing a verdict literally seems to require that if the jury found in favor of plaintiffs they must find against all three defendants, although the jury could have found the essential facts were not the same as to each. This instruction also submitted irrelevant facts concerning financing of plaintiffs' purchase by a de-

fendant dismissed from the case by directed verdict in its favor. On retrial instructions should follow the principles stated in Civil Rule 70.01. See also M.A.I. No. 23.05.

The judgment is reversed and cause remanded.

All concur.