Nadine TROXELL, Plaintiff-Respondent,

v.

Francis M. TROXELL,
Defendant-Appellant.

No. 29225.

Missouri Court of Appeals,
Kansas City District.

Feb. 27, 1978.

Brown, Buckley & Cassing, Sedalia, for defendant-appellant.

George H. Miller, Royal M. Miller, Sedalia, for plaintiff-respondent.

Before WELBORN, Special Judge, Presiding, and PRITCHARD, J., and HIGGINS, Special Judge.

Appeal from judgment which set aside portions of a property settlement between the parties, previously approved as an incident of their divorce, and a warranty deed executed by Nadine Troxell in favor of Francis M. Troxell as an incident of the property settlement.

The questions are whether the evidence warrants findings of fraud practiced by Francis M. Troxell on Nadine Troxell in procurement of the settlement and deed upon which to set them aside; and whether the court abused its discretion in denial of a continuance. Affirmed.

The divorce action filed by Nadine Troxell against Francis M. Troxell was heard by the Honorable Charles V. Barker June 14, 1971. Mrs. Troxell appeared in person and by attorney, Frank M. Brady, now deceased; Mr. Troxell appeared in person. Mrs. Troxell provided evidence sufficient for an uncontested decree of divorce, and identified the property settlement in question.

Nadine and Francis were previously married to each other in 1946 and subsequently divorced. They remarried March 17, 1955, at which time they had three emancipated children from their prior marriage. They subsequently had two children, minors as of the present divorce.

They separated April 8, 1971; and, although she thought she had "treated him pretty good," he would become angry with her and would fuss, quarrel, and bicker with her. He appeared to have lost all affection for her, and they had become incompatible to the point where they could no longer live together.

The following transpired with respect to the property settlement:

"Q Now, you made a property agreement with Mr. Troxell as to your property, and the care of the children * * * And of this $23,500.00 payment, you are to get a thousand dollars a year of that, is that right? A Yes * * * Q And that is the agreement that you signed. A Yes, sir. Q And is that satisfactory to you now? A (Witness ponders.) Well, I guess it has to be. I signed it. * * *

"THE COURT: This property settlement agreement you signed, you said you guessed it has to be all right, because you signed it. It don't have to be all right, if you don't want it to be. Are you asking me to approve this property settlement—or are you not satisfied with it? THE WITNESS: Well, it wasn't what I started out wanting. THE COURT: Is it what you want me to approve today? Are you satisfied with it? THE WITNESS: (Witness ponders.) As long as he holds his word, yes, I will settle for it. THE COURT: What was that $23,-000.00 for? THE WITNESS: Well, I asked for that, because I thought that is what I should have coming for the years [23] that I have put in. THE COURT: Is it in the property settlement * * * that you get so much money, and he gets the rest of the property, or what? THE WITNESS: Yes. THE COURT: What does your husband do? THE WITNESS: Well, right now, he is a salesman for Parkhurst Manufacturing Company. THE COURT: How much a month does he make? THE WITNESS: I think, between four and five hundred dollars a month. THE COURT: You think you can support these children on $37.50 a month? THE WITNESS: I don't think I can. But then, I intend to work.

"THE COURT: What do you think the property is worth that you and he own? Mr. Troxell, maybe you better come up here.

"THE WITNESS: The thousand acre farm, I think is worth at least $80.00 an acre, between eighty and ninety dollars an acre. * * * THE COURT: How much is owed on it? THE WITNESS: Twelve thousand,—eleven thousand, five hundred. THE COURT: You don't think you are getting half of the value there? THE WITNESS: No, I'm not getting half of it. THE COURT: Is your name on the deed? THE WITNESS: Yes, sir. THE COURT: You understand, if the divorce is granted, that you are entitled to half of it,—unless you agree to convey it over to him? THE WITNESS: (Witness ponders.) THE COURT: Do you understand that? THE WITNESS: Yes. THE COURT: Well you are past twenty one. I am not going to argue with you about your rights. But it seems to me that you may not be getting what you are entitled to. Are you asking me to approve it? THE WITNESS: Well, that is up to you. THE COURT: No, it's not up to me. That is what I was asking you. Are you asking me to approve it? Are you satisfied with it? THE WITNESS: Well, that is what I signed. THE COURT: That wasn't what I asked you. THE DEFENDANT MR. TROXELL: That is what I have had, twenty-five years,—

"THE WITNESS: It wasn't what I originally started out asking for. THE COURT: That still isn't what I asked you. I asked you, are you satisfied with it? Do you want it approved? THE WITNESS: I had rather have some more, but I agreed to take it, so I will stick by my word. THE COURT: All right, are you asking me to approve it at this time? THE WITNESS: Yes.

"THE COURT: Do you have any questions you want to ask her, Mr. Troxell, since you are not represented by an attorney? THE DEFENDANT MR. TROXELL: I agreed not to contest, at all. THE COURT: Is that evaluation she placed on the real estate anything near what it is worth? THE DEFENDANT MR. TROXELL: Well, I give $26.00 [$26,000] for it. THE COURT: How long ago? THE DEFENDANT MR. TROXELL: Ten years ago. THE WITNESS: He gave twenty nine for it. THE COURT: If you want me to approve it, I will approve it, except as to child support. THE DEFENDANT MR. TROXELL: It is not anything but brush, trees, —THE WITNESS: You were asking $100.00 an acre. THE DEFENDANT MR. TROXELL: I could ask two hundred, but what difference does that make?

"THE COURT: You understand, Mr. Troxell, this agreement you have with her is not binding on me as to child support? THE DEFENDANT MR. TROXELL: That's right, Judge. THE COURT: I do not think thirty-seven-fifty is sufficient. MR. BRADY: And this is based on the fact of the use of the premises, as long as she wanted to, and these were—THE DEFENDANT MR. TROXELL: It's what we just agreed on—

"THE COURT: This property settlement doesn't provide all of that. I don't know anything about that. * * * You are entitled to be—to take the stand and be sworn, and say anything you want to in reference to this matter, if you want to. * * * Property settlement filed and approved; decree as per entry filed."

Mrs. Troxell filed her action to set aside the property settlement and warranty deed which she executed pursuant to the settlement November 22, 1975.

In Count I she alleged that the property settlement was entered into on or before June 14, 1972, and affected title to two lots in Fristoe, Missouri, and subject tract of 1,000 acres of land in Benton County; that Francis M. Troxell had misrepresented the value of subject tract as well as all the properties which they held by entirety; that she believed his representations and relied on them; that she had learned they were false and fraudulent and made for the purpose of inducing her to join in the property settlement. She prayed that the property settlement be set aside.

In Count II she incorporated the fraudulent misrepresentations of Count I and alleged that she was by them also induced to execute a deed conveying to Francis M. Troxell the 1,000-acre tract in question. She prayed that the deed be set aside.

Mr. Troxell, on November 22, 1975, denied the allegations of fraud, asserted superior or equal knowledge on the part of Mrs. Troxell, and counterclaimed for damages for malicious prosecution.

Mrs. Troxell filed an amended petition to add Count III for damages November 1, 1976; Mr. Troxell filed a number of motions, i. e., to dismiss, to strike, to make more definite and certain, and to elect, in the course of which laches was asserted as a defense.

The case came on for trial November 12, 1976, before the Honorable Kelso Journey, and the following transpired:

" * * * this Court was assigned as Special Judge to sit in this matter on February 12, 1976. * * * The case was set * * * for this date for trial, prior to September 7, 1976. Is the plaintiff ready to proceed, Mr. Miller? MR. MILLER: Yes, your Honor, the plaintiff is ready to proceed. MR. BROWN [for defendant]: No, your Honor, MR. MILLER: * * * plaintiff will at this time ask leave of Court to withdraw plaintiff's amended petition and * * * go to trial on the original petition. THE COURT: Is there any objection * * Mr. Brown? MR. BROWN: * * * I have no objection to his withdrawing his amended petition, but I have objection to his proceeding to trial on his original petition under the circumstances.

"THE COURT: * * * Leave will be granted for the plaintiff to withdraw the amended petition. * * * the original petition in this matter was filed on November 22, 1975; * * * the defendant filed answer and counterclaim to the two counts in the original petition on December 17, 1975, thereby putting the case at issue. What are your grounds for objecting to going to trial at this time, Mr. Brown? MR. BROWN: My grounds * * * are that when he filed the amended petition he raised entirely new matters which were totally foreign to the original petition. Now, I sent a letter down to the Clerk's office some two weeks or so ago, or three weeks or so ago, expecting to go to trial on the original petition. I was advised by the Clerk that there was an expectation that there would be an amended petition filed, and there was one filed within a day or two thereafter. Since the case on that basis was not at issue and could not have been at issue at this late date, because under the rule I had 20 days from the date of the

filing of the amended petition to file a motion or responsive pleading, I filed my motion and I instructed the Clerk not to issue the subpoenaes based on that set of circumstances. * * *

"THE COURT: The Court has examined the amended petition. Its Counts I and II appear to be substantially the same. * * The only change in the amended petition is Count III, which is seeking damages, and plaintiff by withdrawing the amended petition has abandoned the suit for damages. The objection will be overruled. Do you desire to make a statement? MR. BROWN: If the Court please, could I have some time at least to get out some subpoenaes? THE COURT: Mr. Brown, this case was set for trial before September 7, 1976. MR. BROWN: I understand it was set for trial. THE COURT: And the Court was never contacted up until yesterday by yourself. I received in the mail a Motion to Dismiss the Amended Action. I talked to you on the telephone and I told you yesterday that the Court had planned to set this for trial for this date and to be prepared to go to trial, so the Court will proceed in this matter. MR. BROWN: * * * what you say is correct, but then the courthouse here was closed yesterday, * * *. There was no way I could have gotten subpoenaes out. THE COURT: Well, if you chose to cancel your subpoenaes, Mr. Brown, that is a matter for you. This case was set for trial prior to September 13th, and you had no indication from the Court that the case was continued. * * *

"MR. BROWN: Could I have a recess for a little while to get some subpoenaes out? * * * THE COURT: Yes, sir. * * *

"THE COURT: You may proceed, Mr. Miller. The parties have returned with their attorneys. * * *

"MR. BROWN: First I would like to file a formal application for continuance. * * THE COURT: The application for continuance is overruled by the Court for the reason that it is untimely; secondly, it is absolutely in error when defendant states he was not advised of the Court's intention to hear this case until November 11th. * *

this case was set for trial before September 9th of 1976."

During her marriage to Francis, Mrs. Troxell, now 48 years of age, raised their five children, two of whom are still in their teens. She also worked as a waitress to help him finish college, in a dime store to get money for the children's clothing, and as a teacher's aid in two schools where her husband taught. They had lived in Iowa, Nodaway County, Missouri, and Nebraska, prior to moving the household to the Benton County farm in 1965. While in Nodaway County, they first lived in an apartment house which they owned, after which he bought a 160-acre farm and they lived on that. The farm was later sold. They also acquired a service station property in Maryville which, at the time of the second divorce, was producing $75 per month income. She knew nothing of debt against those properties. "He did all the financing things and any notes to sign, why, he told me to sign them, and I signed them, and that is all there was to it."

The Benton County farm of 1,000 acres acquired by the parties in 1959 for $26,000 to $29,000, lies seventeen miles southeast of Warsaw on VV Highway off Missouri Highway 7. Mrs. Troxell and the children moved there in 1965; Mr. Troxell remained in Iowa teaching. At the time of purchase, the farm had about 200 acres of open land. Open land was increased to between four and five hundred acres by 1971, part of which was utilized to raise alfalfa, wheat, and fescue, with the remainder in grass for cattle. The home contained four rooms and bath, was of concrete block construction, and was being remodeled by the family to a two-story house.

Mr. Troxell always did the business in the family; Mrs. Troxell never knew of their mortgages, notes, or how much they owed. "He was continuously telling me that I didn't know anything, and that I didn't need to know anything, and all I needed to do was just sign and do what he told me to do, and he took care of the business." While Mr. Troxell was away teaching, and as a superintendent of schools in Nebraska,

Mrs. Troxell and the children cared for the farm including crops, stock, and improvements.

As the divorce approached, Mr. and Mrs. Troxell discussed settlement of their properties. "He is the one that did all the talking about the property and he would tell you what he was going to do. In fact, he told me I could go down the road with my suitcase, that I had nothing coming." With respect to execution of the property settlement and subject tract, "he said it was mortgaged for all it was worth, and that if we sold everything we had and paid off every debt we owed, neither one of us would have anything left. * * * He kept repeating it [the tract in question] was worth what he gave for it and that it was worth maybe $40,000.00 * * *."

Mr. and Mrs. Troxell discussed the divorce and property settlement around May 14, 1971. "He just more or less said that we were going—see, I had moved out and had had an operation and I was recuperating at my home, and he come up and said, 'Well, let's get this divorce over with. * * I will meet you in town,' so we went in town. He drove his car and I went in mine and we got in there; why, then he told me what—he said, 'Here is what I will do, and I won't do any different.' * * * He told me he would give me the car and the mobile home and he would pay me $23,000.00 for 23 years, or a thousand dollars every year, but no interest * * *. We went over to Mr. Brady's office and he told Mr. Brady everything we had was mortgaged for all it was worth and he said, 'This is what I will do and that is all I will do.'

"Q Who dictated the terms of this property settlement? A He did. Q Did he tell you what you would get if you didn't take that? A He told me I would get nothing and he told me I better take that settlement or else. Q Was there any statement made as to what portion of your net worth you were getting * * *? A He said I was getting the better end of the deal and that I was stripping him, that he was left with the debts. Q * * * Did you believe that you were getting as much as half or more than half of the property? A Well, I had to take his word for it. He had all the records. I didn't know what it was worth. * * * Q (By Mr. Miller) Mr. Troxell said in answer to interrogatory that he offered to split the place with you when you got the divorce. Tell the Court what he offered * * *. A He offered to give me 80 acres of brush way back in the back. There was no road to it. There was no electricity, no water, nothing except just brush. Q Was that in lieu of the $23,000.00? A Yes. * * *

"Q Following this document that you signed, did you then sign this stipulation over in Mr. Brady's office after it was drawn up? A Yes, sir. Q Who drew it up? A Mr. Brady did at the direction of Francis. * * * Q Now, at the time you obtained that divorce, June 14th, did you still assume that whatever he had told you about your property and your debts was true? A Yes. Q And the Court asked you if you wanted him to approve that settlement, and you told the Court— you hesitated and finally told the Court you did want him to approve the property settlement? A (Witness nods head.) * * Yes. Q At that time when you told the Court that, did you still believe that the representations he had made to you about the value of the farm and the fact that you owed more than your assets were was true? A Yes, sir. * * * Q Were you relying upon those statements that he made when you signed the property settlement and when you got your divorce? A Yes, sir, I was. He told me that he was going to court to see that I did not change my mind if I wanted to, and that I had damn better well take the settlement that he fixed up or else.

" * * *

"Q (By Mr. Miller) When did you first learn that you had been misled by Mr. Troxell as to the value of the farm and everything else and that you had been misled as to your property settlement? A When he filed for the children, when he gave his deposition and on the witness stand at that trial [1974]. Q * * * And

then did you start seeking advice as to what the actual market value of that place was? A Yes, sir.  *  *  *  Q When you learned of these things that you have told us about, that his representations were not true, then did you authorize your attorney to file this lawsuit?  *  *  *  A Yes, sir."

The circumstances surrounding the property settlement were developed further on cross-examination.

"Q Now, Mrs. Troxell, when you went to Frank Brady's office, who was Frank Brady representing? A Well, I guess he was representing both of us because he drew up the settlement as Francis told him to draw it up. Q Who drew up the divorce petition? A He did, but the way Francis told him. Q You mean Francis dictated the divorce petition and dictated the stipulation? A He dictated the settlement, yes, sir. Q I am asking you who dictated the divorce petition. A I don't know if there was any dictation to it. * * Mr. Troxell did the talking. Q Now, do you want this Court to believe that Frank Brady sat there and let Mr. Troxell dictate a divorce petition and property settlement agreement? A Yes, sir. Q And he was representing you and he did nothing? A He sure did.  *  *  *  Q  *  *  * Now then, when we came down to the figure that you arrived at of $23,500.00, I will ask you to tell us whether or not it was your idea that you should be paid a thousand dollars for every year you had been married, and that is where the $23,500.00 came in? Isn't that what you told both Mr. Brady and your husband? A No, I did not tell Mr. Brady anything.  *  *  *  He was trying to give me less and I said I wouldn't take anything less than the $23,500.00. * * Q His original suggestion on a property settlement was at a figure less than this? A Yes. Q  *  *  * And I presume that he at some point acquiesced and agreed to pay the $23,500.00? A That was the figure he arrived at.  *  *  *  Q Did you agree to that figure? A There was nothing I could do but agree. Q  *  *  * You didn't argue with him. He told you what to do or you suffered the consequences. * *

"Q Now, the fact of the matter is, Mrs. Troxell, when you are talking about your husband telling you what he was going to do, he told you he would pay you the twenty-three five or there would be a contested divorce, did he not? That is exactly why you asked this to be approved, isn't that a fact? A No, because he told me he was going to court and make sure I did not change my mind, and after I had been deliberately stabbed with a hay hook and I had black eyes and hit in the mouth."

Mr. Troxell estimated the value of the 1000-acre farm at $40,000, subject to $11,830 indebtedness at the time of predivorce discussions between him and Nadine. He maintained they had agreed that all their real properties together had a value of $56,000 subject to $26,830 in mortgages. He also described their personal properties, including livestock, and their then current debts, and estimated they would each be entitled to about $8,000 worth of personal property.

Mr. Troxell gave his version of the predivorce settlement negotiations. They discussed the matter on different occasions. " * * * it would be difficult to say whether it was two, three, four. I was traveling, as has been pointed out. I was working for a company. I only came home on the weekends. When she threw this thing at me, I told her and I sincerely believed it, that we owed very close to what it was worth, the whole thing. Q * * * Did she ever tell you what she thought it was worth? A She has here today, but she has never before that time. * * * she has indicated she relied upon my judgment, but she has always had quite a bit to put in on everything else, so I feel she had plenty to say about that, too. She had her day in court. She had her day when she went to Mr. Brady. She approached Mr. Brady. I never contested it. * * * Q When she went to Mr. Brady, what happened over there with regard to the property settlement? A Well, we had talked about what could be worked out. Q And did she give the information to Mr. Brady  *  *  *? A

I think we had talked about this out at the farm; she denies that. She wanted a thousand dollars for every year that we were married, and we talked about this at great length. I said, 'I don't believe you can go up and down the road here and find anybody who would be in a position to give their wives a thousand dollars for every year they have been married to them, whether it be one year or 40 years,' but I don't know where she dreamed up this idea or what kind of reasoning went into it, but, nevertheless, it sounded completely out of line to me, and that is why we drew up these figures here because she knew what we owed. She maintains she doesn't know what we owed, but there is no reason why she didn't. She signed every one of the contracts. She went with me every time I borrowed the money.

" * * * Q Did you every conceal anything from her about your property or your investments or your borrowing or assets or anything of that nature. A No, sir, we had joint accounts. She wrote more checks than I did. * * * Q She says you offered her 80 acres of that farm. * * * A * * * she wanted the trailer house and I offered to go north of the house, we figured approximately 60 acres right along the road, and I offered her that. Part of that is cleared and it was never given to her in lieu of all of the settlement. It never was intended to be that way. We even went back and built a fence to divide up the farm that laid along the other gravel road, to the south side of the farm, and she was with me. We measured; we walked it. We spent a lot of time trying to figure out what was fair, how we could get 60 acres or 80 acres carved out of a thousand acres of land. Q The 80 acres or 60 acres, whatever it was, along the road, how would it have compared in value to the remainder of the farm? A Well, it would have compared very favorably to some 900 acres of it, which it was trees, this is true; the only land there is what lies along the road, that is the only land there is on that farm. Q The value is in that which is along the road? A That is where it is at. * * *

"Q Mr. Troxell, did you dictate that settlement agreement? A I didn't dictate anything. Q To your knowledge, who prepared it? A Her attorney, Mr. Brady. Q Was there ever at any time, from your observation, that he gave any indication to you that he was doing other than protecting Nadine's interest to the best of his ability under all of the circumstances? A No, because he was her attorney. She contacted Mr. Brady. Q He never did discuss this matter with you, privately I am talking about? A No, not privately. In other words, I was there and we hashed this thing out, and we even approached the Osage Valley Bank to act as the escrow agent, and the record shows over there they were approached to handle the payments and the money would be put over there, and in the course of the deal I think written in this agreement someplace, it shows that if the farm was ever sold, that her money would be put in the Osage Valley Bank and would earn interest and the interest would be accumulated and she would be given the thousand dollars each year. * * * Q She lived out there for about three years after the divorce, didn't she, on that farm? A Yes, sir. * * * Q Did she say anything to you in that period of time of about three years when she lived out there that she thought she got the short end of this settlement? A Never. She has never been able to come up with a witness of any kind that showed me she ever told me she was unhappy. * * * she never indicated any disinterest or she had been defrauded in any way until she approached Mr. Miller was the first time we heard about it. * *

"Q Did you hear the testimony when she told the Judge in her judgment the property was worth eighty or $90,000.00, in essence, eighty or $90.00 an acre? A No, sir, I cannot recall her ever saying that, but it has been—I guess somewhere along the line it has been brought out that she did say this. Q You didn't hear all of her testimony, I take it? A No, I didn't, because she talked low and had the martyred attitude as she usually does."

Mrs. Troxell graduated from high school and during her marriage acquired 30 hours of college credit. She has since become a beauty operator. Mr. Troxell holds a Bachelor of Science degree from Northwest Missouri State Teachers College, a Masters degree in Education from the University of Missouri, and a Specialists degree in School Administration from the University of Nebraska, over 200 college hours all told. In addition to teaching, farming, and managing business properties, he has also dealt in the stock market.

W. D. Blake, a real estate broker from United Farm Agency at Preston, Missouri, valued the 1,000-acre farm as of June, 1971, at $125 to $150 per acre ($125,000 to $150,-000). Mr. Troxell told him in 1974 that he would sell it for "$175,000 net to him."

Ruby Davis, a real estate broker in Warsaw, Missouri, valued the farm as of June, 1971, at $125 to $135 per acre ($125,000 to $135,000) in a "cash sale."

Douglas McCain, a real estate broker in Lincoln, Missouri, judged the farm could have been sold for $120,000 in May and June, 1971, and that it had a value in November, 1976, of $200,000.

The court found:

"1. That Defendant, in obtaining the Property Settlement with Plaintiff dated May 12, 1971, and the subsequent deed of real estate from Plaintiff pursuant to said Settlement, represented to Plaintiff that:

"A. Their liabilities acquired during their years of marriage approximately equaled the value of all their assets; and

"B. The market value of their 1000 acre Benton County, Missouri jointly owned farm was $40,000.00 at said time; and

"2. That said representations were false; and

"3. That Defendant knew that said representations were false and in fact untrue, and Defendant made such representations knowingly, intentionally, deliberately, and wilfully, for the purpose of inducing Plaintiff to enter into said Property Settlement and to execute and deliver to him said deeds pursuant thereto; and

"4. Said representations were material to entering into the Property Settlement by Plaintiff; and

"5. Plaintiff relied on said representations in entering into the said Property Settlement with Defendant, and in so relying Plaintiff used ordinary care considering her unequal facilities for ascertaining the truth, her situation generally with her relation to and treatment by Defendant, and that the facts were peculiarly within the knowledge of Defendant; and

"6. As a direct result of such representations Plaintiff was cheated, defrauded and overreached by Defendant; * * *

"8. The court further finds from the evidence that the fair market value of the parties' said 1000 acre Benton County, Missouri farm on May 12, 1971, was $135.00 per acre, or $135,000 rather than the $40,000.00 value represented by Defendant to Plaintiff when said Property Settlement was executed.

"9. The court further finds that the parties 50–50 or equal basis for dividing their said [other] properties to have been fair and reasonable considering all their factors and their relative contributions during their said marriage. That, aside from the division of the 1000 acre farm, the value each has received to date from their other property and the payments made to date by Defendant to and for Plaintiff or for indebtednesses, less the value of Defendant's free use of Plaintiff's one-half share of said farm, is equal. Therefore, no re-distribution of any of said other property is ordered by the court, nor is any contribution from one party to the other ordered for any such payments since the divorce to this date.

"10. Defendant's contention * * * that Plaintiff was represented by an arms-length attorney in negotiating said Property Settlement is unfounded. The evidence clearly showed that the involved attorney never entered into the negotiations and only served as the scrivener in writing the Property Settlement as dictated by Defendant after Defendant had wrongfully induced Plaintiff to agree to the same by his aforesaid misrepresentations.

"11. Defendant's grounds \* \* \* for a Continuance of the trial on November 12, 1976, are not well-founded. This cause was set for trial for this date prior to September 9, 1976. By letter in the file from Defendant's attorney dated October 27, 1976, the clerk was directed to issue subpoenas for November 12, 1976 to H. D. Honea, Ed Button, Nancy Gardner and Larry Rose. By memorandum thereon dated October 29, 1976, the Deputy Circuit Clerk \* \* \* was directed by Defendant's attorney not to issue the aforesaid requested subpoenas. This was done without any change in the trial setting authorized by the undersigned judge. Witness Ed Button appeared and was present in court in response to later subpoena, but was not called as a witness by Defendant. Further, Defendant's Motion for a Continuance filed after the commencement of the trial was not only untimely, but did not meet Supreme Court Rule No. 65.04 requirements for seeking a continuance for absent witnesses."

Upon these findings the court ordered and adjudged:

"A. The Property Settlement between the parties dated May 12, 1971, is hereby set aside, cancelled and held for naught because of the legal fraud Defendant practiced upon Plaintiff in obtaining the same.

"B. The judgment for $23,500.00 Defendant was to pay Plaintiff mentioned in said Settlement and the resultant Deed of Trust and lien therefor Defendant gave Plaintiff on the said 1000 acre Benton County, Missouri farm is cancelled and set aside and held for naught.

"C. The distribution and division between the parties of all of the parties' property, both real and personal, owned by them on June 14, 1971, when they were divorced, with the exception of said 1000 acre Benton County, Missouri farm, is hereby ordered, reaffirmed and ratified by this court, with no contribution required or ordered from Plaintiff to Defendant because of Defendant's payments of any indebtedness of the parties, liens or taxes on any property, or payments of money by Defendant to Plaintiff or in her behalf or for any improvements on said 1000 acre farm since said divorce, and further, the Clerk of this court is hereby directed to pay over the moneys Defendant has paid into court in Plaintiff's behalf to the Plaintiff.

"D. The ownership of an undivided one-half share of the said 1000 acre farm [legally described] is hereby vested in Plaintiff, Nadine Troxell, with the remaining undivided one-half share in Defendant, Frances M. Troxell, as tenants in common, subject to the approximately $9,000.00 unpaid principal balance on the note and first deed of trust on said farm \* \* \*. Inasmuch as Defendant has had the sole beneficial use and the income from all of said farm since the divorce of the parties, he shall not be entitled to any contribution from Plaintiff for any interim payments he has made on the principal and interest on said \* \* \* loan, or on any other lien or taxes thereon, or for any improvements made during said time, and further, Defendant's share in said farm shall be and is chargeable for all the 1976 taxes and for the payment of interest on said loan until January 1, 1977, and thereafter a one-half share of the same shall be paid by each party. \* \* \*

"The warranty deed purporting to convey Plaintiff's undivided interest in said 1000 acre farm to Defendant, executed and delivered on or about June 14, 1971, and recorded in Book 316 at Page 847 of the Deed Records of Benton County, Missouri, is hereby set aside and held for naught insofar as it purports to convey to Defendant the interest of Plaintiff in the aforedescribed 1000 acre farm. \* \* \* Defendant's Counterclaim \* \* \* is hereby dismissed and denied."

Appellant contends the court erred in finding the issues in favor of plaintiff "with no substantial or credible evidence to support such findings"; that it would have been more appropriate for plaintiff to petition for modification; and that plaintiff is guilty of laches.

Appellant does not demonstrate support for his contention that plaintiff should have proceeded to modify the divorce de-

cree rather than to seek to have the incident property settlement and warranty deed set aside. This is understandable in that case law, e. g., *McCarty v. McCarty*, 300 S.W.2d 394 (Mo.1957), recognizes actions to set aside a warranty deed and property settlement executed prior to and in contemplation of divorce, allegedly procured through fraud.

■ The elements of such an action are the same as any action for relief on grounds of fraud: a representation, its falsity, its materiality, speaker's knowledge of the falsity, his intent that his statement should be acted upon by the other party and in the manner contemplated, that party's ignorance of the falsity, his reliance on its truth, his right to rely thereon, and his consequent injury. *Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483, 488 (Mo. banc 1966).

"Ordinarily an agreement between husband and wife for a property settlement must be procured without a violation of the general rules which control the actions of persons occupying confidential relations with each other, unless the confidential relationship has already been severed and the parties are dealing with each other at arm's length, as through an agent or attorney. * * * In addition to being free of fraud * * * agreements between husband and wife in settlement of property rights should * * * be fair, just and equitable." *McCarty v. McCarty*, supra, 300 S.W.2d l.c. 403.

■ The case has been stated in length and detail because such statement demonstrates evidence to support the findings necessary to relief to plaintiff on grounds of fraud and that the court made all such necessary findings. It also demonstrates conflicting versions of the events surrounding procurement and execution of the property settlement and deed; and resolution of such conflicts is the province of the trial court. Rule 73.01.3, V.A.M.R.

■ Nor is the plaintiff guilty of laches. It is true as asserted by appellant that Mrs. Troxell continued to live on and work the

farm as before the divorce for three years following the divorce. She explained, however, that she was unaware of defendant's misconduct in procurement of the settlement and deed until the 1974 proceedings in which defendant sought to modify the child custody provisions in the divorce decree. She took action immediately thereafter to become advised and sue for her rights. *Metropolitan St. Louis Sewer District v. Zykan*, 495 S.W.2d 643, 656[18–24] (Mo. 1973).

■ Neither is there any abuse of the court's discretion in refusal of the continuance sought by defendant on the day of trial of a case set for trial two months in advance.

Appellant argues that this case was not at issue on the date of trial because defendant had not answered the amended petition. Appellant's citations in support of this argument, *Weir v. Brune*, 364 Mo. 415, 256 S.W.2d 810 (Mo.1953), and *Savings Finance Corp. v. Blair*, 280 S.W.2d 675 (Mo.App. 1955), stand for the proposition that where trial is accorded on an amended petition, issues raised by the original petition are deemed abandoned. Such is not this case where the amended petition was withdrawn and trial was accorded on the issues of the original petition, and the answer and counterclaim thereto. With respect to appellant's assertions of inability to secure attendance of witnesses, suffice to say that the motion for continuance did not comply with Rule 65.04 which mandates the content of an application for continuance on account of absence of witnesses.

Judgment affirmed.

All concur.