Milan GERICH, Plaintiff-Respondent,

v.

**GENERAL MOTORS CORPORATION,**
**Defendant-Appellant.**

No. KCD 30081.

Missouri Court of Appeals,
Western District.

Sept. 4, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 1, 1979.

Application to Transfer Denied
Nov. 14, 1979.

Paul Scott Kelly, Jr., and Dennis Egan, Kansas City, for defendant-appellant.

David Skeer and John F. Michaels, Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

Plaintiff Milan Gerich had a verdict against defendant General Motors in the sum of $37,348, based upon his claim of fraudulent misrepresentations made by defendant General Motors to plaintiff by which plaintiff was induced to purchase the assets of the Hicks Brothers Chevrolet dealership in Kansas City. The purchase of the assets was actually made by Milan Chevro-

let, Inc., a newly formed corporation, in which plaintiff had invested $50,000 and of which he was president and managing officer. His $50,000 investment was represented by non-voting Class "B" common stock. The balance of the capitalization, $550,000, was contributed by General Motors and was divided equally between all the Class "A" voting stock of the corporation and long-term promissory notes. The business was unsuccessful and was liquidated within only a few months, resulting in a loss to Gerich of $50,000, the entire amount of his initial contribution. The General Motors loss upon liquidation was $379,277.86.

Plaintiff blames his losses upon the fact that Hicks Brothers Chevrolet, Inc., on June 1, after its sale to plaintiff on March 14, 1974, entered a suburban Chevrolet dealership in competition with Milan Chevrolet.

Plaintiff claimed that the fraudulent representations which General Motors made to him, and which induced him to enter into the ill-fated venture, were, in the language of plaintiff's verdict-directing instruction, "A. That Hicks Brothers Chevrolet, Inc., would not get another General Motors franchise . . . or B. That the Hicks Brothers financial statements given to plaintiff presented a true statement of the performance of the company as to fleet sales made in the ordinary course of business . . . ."

Hicks Brothers Chevrolet, Inc., had been a party to the action, but it had been dismissed from the suit upon the payment of a $10,000 settlement figure.

The case comes to us on appeal on a single point, i. e., that the court erred in denying defendant's motion for a directed verdict in that the evidence failed to make a submissible case of fraud. As against such a claim, we do not review the evidence to make our own independent judgment upon the facts. We review it to ascertain only if there was substantial evidence to support the verdict of the jury. We consider only the evidence, and the reasonable inferences therefrom, which tend to support the verdict. That evidence is excluded from consideration which is contrary to the verdict. *Ackmann v. Keeney-Toelle Real Estate Co.*, 401 S.W.2d 483 (Mo. banc 1966); *Lesser v. Rubin*, 548 S.W.2d 860 (Mo.App. 1977); *Clark v. McCloskey*, 531 S.W.2d 36, 37 (Mo.App.1975).

Furthermore, the verdict and judgment are to be upheld against defendant's motion for a directed verdict if the evidence supports *either* of the disjunctive propositions submitted to the jury, even though it might not support the other. *DeLay v. Ward*, 364 Mo. 431, 262 S.W.2d 628, 630 (banc 1953); *Ashton v. Buchholz*, 359 Mo. 296, 221 S.W.2d 496, 502 (1949); *Hammon v. Gentemann*, 423 S.W.2d 5, 7 (Mo.App.1967).

We conclude that plaintiff made a submissible case on the first of the above submissions, i. e., that defendant represented that Hicks Brothers would not get another General Motors franchise, and we therefore affirm the judgment. This is not to hold he did not make a prima facie case on the second ground submitted.

The Hicks Brothers Chevrolet dealership at 1601 McGee in Kansas City was owned by a corporation in which the Hicks Brothers, Bill and Ben, were non-voting common shareholders and managers. General Motors, however, or Motors Holding, owned all the voting stock of the corporation, and also was a creditor upon long-term notes of the corporation. Motors Holding was an operating division of General Motors and was the arm of the company which financed dealerships selling General Motors automobiles. The five directors of the corporation were: The two Hicks brothers, and three employees of General Motors, namely, E. W. Broome, Kansas City branch manager for Motors Holding Division; Park Price, III, investment manager for Motors Holding; and R. A. Trent, western regional manager for Motors Holding.

For reasons hereafter explained, General Motors had determined that the Hicks Brothers Dealership was to be sold. The Hicks brothers, Bill and Ben, had resisted the sale and indeed had expressed a desire to buy out the General Motors investment and continue the operation of the dealership. For reasons difficult to understand, General Motors had turned them down.

The history that led to the decision to sell the dealership was as follows: General Motors auditors had discovered during an audit of the corporate books for the period of January 1, 1973-April 30, 1974, that there was a $53,000 shortage. The Hicks brothers, confronted with the audit report at a special directors' meeting August 29, 1974, at first explained to the directors that this money had been used as payments to influence employees of purchasers of automobile fleets. At one place in the evidence the payments are referred to as "birddog fees".

At an October 1 directors' meeting, the brothers were asked to "disassociate themselves from the dealer company". They asked if they could instead be permitted to retire the General Motors investment, and were advised that this would not be permitted. After this meeting, the brothers Hicks reported that about $30,000 of the $53,000 (which they previously had said had been paid to persons representing fleet customers) had actually been used to pay a personal promissory note owing by them to their predecessor owner of the dealership, and an additional $1,200 had been used to pay, or pay on, a loan from Bill Hicks to Ben Hicks. Presumably the remaining $21,800 had been used, as they had earlier explained, to influence fleet customers' employees.

Director Trent at a directors' meeting the next day, October 2, stated, as disclosed by minutes of the meeting, that the recommended selling procedure was to "request the Car Division in writing to assist in finding a buyer for the company's assets and the company be liquidated through sale and an orderly process, their peers in the automobile business or anyone else would not be aware of anything other than that they had voluntarily requested to sell the assets of the company." Mr. Trent reminded the brothers Hicks that embezzlement was a felony. Both brothers assured the directors that they had no intention of being disagreeable or unreasonable and would cooperate fully with the directors' recommendation.

The Hicks brothers appealed the directors' decision to sell to Mr. William Harvey, III, who was the general manager of the Motors Holding Division of General Motors. They met with him at Detroit on October 4. They offered to buy out the Motors Holding's investment in Hicks Brothers Chevrolet. This request was unavailing, however, Harvey explaining that Motors Holding's investment could be retired only through dealership profits. The decision to sell stood unchanged.

After this meeting, the subject of the Hicks brothers' getting into another dealership was introduced. According to the deposition testimony both of Bill and of Ben Hicks, Harvey said, "They would not blackball us, being Motors Holding, on any other General Motors line, period." "Q. Do you mean any other than Chevrolet?" "A. Any line." After a year or a year and a half, Harvey told the Hicks brothers, Motors Holding would "go back in as partners" with them, as a Chevrolet dealer or in any other General Motors line. According to Harvey's account of the meeting, Harvey told them he would not "attempt to adversely influence whichever car division might be involved". He agreed that he had told them he would consider financing them in a dealership after a period of performance on their part with a "desirable record".

A Hicks Brothers directors' meeting on October 8 made final the decision to sell the dealership, and the decision of the brothers Hicks to "disassociate". The minutes of the meeting stated that a letter would be forwarded to Mr. W. L. Woodin, Chevrolet zone manager, requesting his assistance in finding a buyer.

The minutes of the October 8 meeting also show the following: "Continuing, Mr. Broome stated that he wished to offer a word of caution. He advised that when negotiating with a prospective buyer, it should be done on a realistic basis, that is, no reasonable offer should be refused or prospective buyer discouraged from negotiating on a reasonable basis. Those present agreed it was imperative a sale of the stock or company assets be consummated at an early date to avoid potential loss to the stockholders."

At this juncture the plaintiff Milan Gerich entered the picture in Detroit. On October 9, 1974, which would be the day after the meeting described in the preceding paragraph, he entered the Detroit office of William Harvey, III, in quest of a dealership, with Chevrolet being his first choice. (Harvey places the date almost a month earlier, on September 12.) The meeting was by a previously arranged appointment. Park Price (a director of Hicks Brothers Chevrolet, but absent from the meetings of August 29, October 1, October 2, and October 8) was also present at this conference and took Gerich to lunch.

This conference was exploratory on both sides, and no mention was made of the Hicks Brothers dealership in Kansas City. Other dealerships, on which Harvey had files, were mentioned. None of them appealed to Gerich. Gerich said he preferred Chevrolet, and a midwest location. Harvey gave Gerich a booklet describing the Motors Holding plan, under which General Motors would invest in dealerships. This plan contemplated that General Motors would invest 75% of the capital of a dealership, half of which would be represented by all the voting "Class A" stock of the corporation, and half by a long-term note. The operator would contribute a minimum of 25% which would be represented by non-voting "Class B" stock. Harvey observed that the $50,000 which Gerich could contribute was "a little light" for the kind of high-volume urban dealership he had in mind. Price, at Harvey's direction, furnished Gerich an application form which Gerich took with him for completion.

Gerich had been connected with automobile dealerships for 28 years at that time, 22 years as sales manager and general manager. He was at the time the 25% owner of a Ford dealership in the Detroit area, of which he was also general manager. He had had no experience in the financing of dealerships, however, and there is no testimony that he ever participated in the purchase or sale of a dealership.

The application was completed by Gerich and submitted to Harvey. Gerich received a letter from Price, stating that they were investigating his references and his credit. After the lapse of some additional time, Gerich called Harvey and learned that the investigation was complete. An appointment was set up for another conference on November 11, 1974, in Harvey's office in the General Motors Building in Detroit.

The November 11 conference proved to be a critical one. Harvey stated to Gerich that he had a Chevrolet deal available, "a real plum". The "real plum" was the Hicks Brothers dealership in Kansas City. He had the dealership's financial statements for the years 1971 through 1973, and the 1974 statement through September. These were examined and discussed at the conference. The three persons at the conference —Gerich, Harvey and Price—testified that the fleet sales came under scrutiny. For one thing, Gerich observed, the per-unit gross was abnormally high. (Later, when Gerich came to Kansas City and discussed the financial statement with Bill Hicks, the ratio between fleet and individual sales was commented upon. Whereas the ratio should be 75% retail to 25% fleet, according to Gerich, the Hicks Brothers ratio was 50%–50%.) Nothing was said to plaintiff about the audit report which showed the $53,000 discrepancy which had precipitated the offering of the dealership for sale. Gerich asked why the Hicks Brothers dealership was being sold. Harvey told him that it was because of "contract violations", or "disagreement of the parties". He declined to amplify his answer, stating that the details were confidential. When Gerich asked what the Hicks brothers were going to do, Gerich testified that Harvey replied that "he didn't care what they were going to do. They would never get another GM franchise anyway." Gerich testified at the trial that that answer made a difference to him. "I would want to know who my competition is going to be, if I bought them out," he said. Harvey at the trial denied making the statement.

At the November 11, conference, the subject of capitalization for the dealership was discussed. Harvey suggested $450,000, of

which Gerich would contribute $50,000 and General Motors $400,000, divided equally between capital stock and a long-term note.

At the conclusion of the meeting, Gerich took with him the Hicks Brothers' financial statements. He consulted with associates in the automobile business and shortly notified Harvey that he would like to go to Kansas City to look at the dealership. Harvey said he would call Broome in Kansas City and make the arrangements. Broome, as noted, was Kansas City branch manager for Motors Holding, and was also a director of Hicks Brothers Chevrolet. Gerich himself then called Broome, and on November 20 came to Kansas City. Broome met him at the airport and drove him around the city. Of the Hicks brothers, Broome said "that he would be glad to get rid of those troublemakers . . . contract violations of Motors Holding . . . he had a pile of minutes a foot high." Like Harvey, Broome declined to give details of the violations.

Gerich then talked with Bill Hicks at the dealership. He reviewed the financial statements. The ratio of fleet sales and retail sales was discussed, Gerich observing that the retail sales were low in relation to the fleet sales. Hicks replied that they were working on it. Gerich explained at the trial that most of the fleet purchases (a fleet consists of ten or more cars) are made during the first half of the model year, and that retail sales should account for 75% of the total volume.

The next morning Gerich had his first contact with the Chevrolet division of General Motors when Broome took him to the zone offices in Lenexa, Kansas. There Gerich met with Mr. Woodin and Mr. Carbin, zone manager and assistant manager respectively. Carbin gave a sanguine appraisal of Kansas City's economic situation, especially of the downtown area where the Hicks Brothers' dealership was located. Woodin thought the $450,000 capitalization was light for the dealership, but that it should be $600,000 or $650,000. Gerich received an application for a franchise.

On the return of Gerich and Broome to Broome's office, Broome said the price of the "fixed assets and good will" of the Hicks Brothers' dealership was $130,000.

Gerich returned to Detroit, and in December notified Harvey that he was interested in going ahead. Harvey said he would contact Broome and set up another appointment to negotiate the sale. Gerich testified that, although the price for the fixed assets was $130,000 as he then understood it, that there remained to be negotiated the used car inventory, demonstrators, parts inventory, rental cars and the like.

On January 15, 1975, Gerich came to Kansas City. He had in the meantime resigned his job effective December 31, 1974.

As negotiations commenced at the Hicks Brothers' dealership, the brothers Hicks named a price of $218,000 for the fixed assets and good will. Gerich, upon his return to his hotel room, called Broome to challenge the $218,000 price as against the figure of $130,000 which Broome had mentioned on Gerich's November visit to Kansas City. Broome replied he would "straighten those guys out". The next morning, January 16, Gerich and the brothers Hicks were to meet in Broome's office to negotiate the terms of an "option to purchase". Gerich arrived first. Broome told Gerich the price would be $150,000. Gerich said that figure would be agreeable. Gerich asked Broome if there would be a "non-compete" clause in the option to purchase. Broome at the trial denied Gerich had asked about a non-competition clause. Gerich testified that Broome "stated to me that I wouldn't need one because they wouldn't get a GM deal". Gerich said, "Fine". When the Hicks brothers arrived, Broome acted as chairman of the meeting. By afternoon the terms of the option had been agreed upon. It was typed in Broome's office and there signed by the Hickses.

After this had been completed, still in Broome's office, Gerich completed an "Application for Investment by Motors Holding Division under Motors Holding Dealer Investment Plan".

Gerich made one more trip to Kansas City before the closing of the sale which took place March 14, 1975. During a conversation with the Hicks brothers on this occasion, they said they were going to try to get back into the automobile business. They asked Gerich his opinion about a Chrysler-Plymouth franchise. Gerich replied Ford would be better. They mentioned a small town agency, Barter Buick-Pontiac, which one brother would take. "They wanted a much smaller deal with a lot less overhead and a lot less people . . They were each going to go their separate ways," Gerich testified.

On March 14 the sale was closed and Gerich assumed management of the dealership. As earlier explained, the purchase was actually made by Milan Chevrolet, Inc., a newly-formed Delaware corporation. The directors, besides Gerich, were Broome and Trent, both employees of Motors Holding and also directors of Hicks Brothers Chevrolet, Inc.

In February Gerich had ordered from General Motors new identification signs for the dealership. The lease agreement (for the signs) was signed March 24. Gerich was told he could expect delivery of the signs in May. In the meantime, the Hicks Brothers signs remained on the dealership, until they were removed in May in circumstances hereafter described. It was August before the new signs were delivered.

In the early part of May Gerich learned that Hicks Brothers were going back into business as Chevrolet dealers. He called Broome about it. Broome said he would find out about it and get back to Gerich. Next day Broome came by Milan Chevrolet. "Yes, it's true," he told Gerich, according to Gerich's testimony, "but don't worry, Harvey will block it in Detroit." Shortly thereafter, on about the 15th of May, Gerich learned from Jim Hicks (who was working at the Milan Chevrolet dealership, making assignments of accounts receivable, as an employee of Hicks Brothers) that Hicks Brothers had been approved as Chevrolet dealers in Kansas City on Hickman Mills Drive in a dealership operated by Jerry

Debacker Chevrolet. They commenced the operation of the business on June 1.

Gerich, after learning in mid-May about the new Hicks dealership, began at once to paint out the Hicks Brothers signs which were still on the dealership buildings. From then until August, when the new signs were installed, the dealership had no identifying signs.

Several of the key employees of Milan Chevrolet performed in desultory fashion under the new management of Gerich. On March 14, the day Gerich assumed management of the dealership, he found that Ray Shaw, leasing and fleet manager, was going to go with Hicks Brothers as manager of their leasing business (the leasing business was not sold to Gerich but was retained by Hicks Brothers.)

Virgil Shirky had been a retail salesman for Hicks Brothers and continued with Milan after the sale. Gerich discussed Shirky's becoming a "crew manager" over three to five salesmen. His sales performance had not been up to his previous standard since the change of ownership. Gerich was unable to meet his pay requirements as a crew manager, so he was not made a crew manager. "He practically stopped working," Gerich testified. One day without any notice he quit. He was employed by Hicks Brothers Chevrolet at their new location.

Similarly, the performance of Travis Wheeler, a fleet salesman who handled the Farmland Industries Fleet account, the dealership's largest, was below par. About June 1 he quit to sell dump truck beds. A week later he was employed by Hicks Brothers Chevrolet and at the time of trial was their sales manager.

Hicks Brothers Chevrolet newspaper advertisements began to appear in June. The earliest such ad to be introduced in evidence was dated July 10, 1975. "We've moved!" it said, "Now we're moving our big, big inventory of over 350 new cars—buy at tremendous savings now!!" The new address was given as 115th and 71 Highway.

A September 21 advertisement of Hicks Brothers featured Mr. Virgil Shirky as

"salesman of the month" for August, who cordially invited "old and new customers to call him for all their automotive needs."

Two of the largest of the Hicks Brothers fleet customers had been Farmland Industries and Budget Rent-A-Car. Gerich had attempted to have Travis Wheeler set up appointments with them to cultivate the business after Gerich took over. Wheeler never got this done, and Gerich afterwards failed to make contact with the purchasers. After Wheeler had quit Milan Chevrolet, and after he had commenced working for Hicks Brothers at the new location, Gerich called Bill Hicks to complain. When they had completed their conversation on that subject, Hicks said to Gerich: "Milan, you might as well forget about Farmland and Budget . . . I have got written contracts with both those companies, so there is no way you can get them."

We may now draw our narrative quickly to its close, for the defendant on this appeal makes no issue of the rapid decline of Milan Chevrolet, Inc. We shall state the evidence on this point more fully as we discuss the subject of damages later in our opinion. On July 15, 1975, plaintiff Gerich submitted his resignation as president of Milan Chevrolet effective July 1, 1975, although he continued to manage the business until November 15, 1975. A directors' meeting of September 29, 1975, determined to liquidate the business. It was noted that losses through August 30 had accumulated to $83,098.75 and that the cash position was precarious. The liquidation of the business was substantially completed by November 15, resulting in a loss exceeding $400,000. Under the contract between Motors Holding and plaintiff Gerich, the Class B stock (by which Gerich's $50,000 investment was represented) was first absorbed, then the Class A stock which belonged to Motors Holding. Thus the plaintiff lost his initial $50,000 investment, while General Motors lost $379,277.86 of its initial investment of $550,000. Although defendant does not claim that the evidence does not support the fact that defendant suffered losses, it does claim that the losses cannot be laid to Hicks Brothers' competition and hence cannot be blamed upon General Motors' misrepresentation that Hicks Brothers would not get a GM franchise.

Plaintiff also presented evidence of his personal loss of earnings, and his travel and moving expenses connected with the venture.

We will now take up the points at which defendant says plaintiff's case is deficient.

*Representation of existing fact.*

Defendant contends that the representations claimed by plaintiff to have been made by Harvey and Broome were not true representations of preexisting or present fact, and thus were not actionable. Defendant says they were instead mere opinions or predictions of a future contingency over which Harvey, the speaker, had no control.

It is true that if the evidence will allow only defendant's construction of the alleged fraudulent misrepresentations, then such cases as *Yerington v. Riss*, 374 S.W.2d 52, 58 (Mo.1964), cited by defendant, would hold that plaintiff's case must fail.

But plaintiff answers that the evidence justifies the characterization of defendant's representations as representations of a state of mind, or of a present purpose. If the evidence will reasonably allow that construction, our cases hold that the representations are statements of existing fact and actionable. *Dillard v. Earnhart*, 457 S.W.2d 666, 670-1 (Mo.1970); *Brennaman v. Andes & Roberts Brothers Const. Co.*, 506 S.W.2d 462, 465 (Mo.App.1973); *Metropolitan Paving Co. v. Brown-Crummer Inv. Co.*, 309 Mo. 638, 274 S.W. 815, 823 (banc 1925).

The initial statement of Harvey made to plaintiff at the November 11 meeting, that Hicks Brothers was being "terminated" and would never get another GM franchise is itself couched in emphatic terms. The statement bespoke a hardened corporate disfavor on the part of General Motors toward Hicks Brothers. Observe:

"Q. I (plaintiff Gerich) asked what they were going to do.

A. What did he (Harvey) say?

Q. *He didn't care what they were going to do. They would never get another GM franchise anyway."*

(Emphasis supplied).

The statement gathered support from later statements made by Harvey and by Broome. Harvey spoke of "contract violations" of Hicks Brothers, but on the grounds of confidentiality declined to amplify. Broome later, when plaintiff visited Kansas City in November, spoke of the Hicks Brothers as "troublemakers" of whom he would be glad to be rid, and indicated that their misdeeds were documented by "a pile of minutes a foot high". Later still, on January 16, 1975, as preparations were being made for drafting the option to purchase which, if exercised by plaintiff, would become the sale-purchase contract, Broome told plaintiff no "non-compete" clause was needed because Hicks Brothers "wouldn't get a GM deal". These statements by Broome added plausibility and authority to Harvey's earlier statement that Hicks Brothers "would never get another GM franchise".

In effect, the Harvey statement buttressed by Broome, implied a history of unsatisfactory dealings with Hicks Brothers and implied an existing relationship with them which foreclosed the possibility of their securing another franchise to sell General Motors automobiles. Gerich could reasonably believe, and so the jury could have found, that Harvey's representation was of a settled corporate purpose, existing at the time of the representation, not to grant a General Motors franchise to Hicks Brothers.

The actual fact was that there existed no such corporate purpose, and no flinty corporate intention not to grant a General Motors franchise to Hicks Brothers. For aught the record shows, Hicks Brothers would suffer no disadvantage or handicap upon application for a franchise. On this point there is no dispute. Thirty-eight days before the November 11 statement to plaintiff Gerich, Harvey had had a conversation in Detroit with Bill and Ben Hicks, which contemplated their securing a General Motors franchise, not excluding Chevrolet.

Harvey had assured them that he would not "adversely influence" any application for a franchise. He had even suggested after a decent length of time that Motors Holding would finance them in a dealership, or two dealerships, in any General Motors line.

Two and one-half months after the March 14 closing of the sale of the Hicks Brothers dealership to plaintiff Gerich, Hicks Brothers commenced operating under a new franchise the former Jerry Debacker Chevrolet dealership. Our record does not show when the franchise was approved by General Motors, but plaintiff Gerich learned of it in early May. The promptness of the reentry of Hicks Brothers into the Chevrolet market is itself corroborative of the absence of any corporate disfavor on defendant's part.

*Plaintiff's reliance upon representation.*

Defendant says plaintiff should not have relied upon Harvey's statement—that he should have gone to the Chevrolet division, the "best authority", if it was important to him, to learn if Hicks Brothers might get a Chevrolet franchise. Defendant points out that Harvey was the general manager of Motors Holding, a division of General Motors which financed dealers, while the granting or withholding of a franchise was up to the car division concerned, in this instance the Chevrolet division. A similar argument was made, and rejected after close examination, in *Tietjens v. General Motors Corporation*, 418 S.W.2d 75, 81 (Mo. 1967).

Defendant also emphasizes plaintiff's long and varied experience in the automobile business which we have earlier described. Gerich should have known, it argues, that General Motors was no monolithic organization and that the various operating divisions, including Motors Holding and Chevrolet sales, operated independently and at a distance from each other. The jury could reasonably find otherwise. They could have found that there was nothing in plaintiff Gerich's experience or background which would have acquainted him with the internal structure of General Motors and with the interrelationships of its various operating divisions. For that matter, the

evidence shows there was a considerable degree of cooperation among the operating divisions.

In connection with the question of plaintiff's reliance upon Harvey's representation, and his right to rely thereon, defendant in his brief emphasizes that Harvey could not control the granting or withholding of Chevrolet franchises. Whether he could or could not was not really the issue presented to the jury by the plaintiff's verdict-direction instruction. That instruction required the jury to find that "Harvey and Broome, or either of them that made such representation, did not know whether such representation was true or false". This placed plaintiff's case upon the ground of a negligent misrepresentation, rather than upon the ground of a knowing false representation. *Huttegger v. Davis,* E.D. No. 38,808 and No. 38,820 (filed May 29, 1979, 6–8; *Wilson v. Murch,* 354 S.W.2d 332, 338–9 (Mo.App.1962). Harvey's control of the granting of Chevrolet franchises would be relevant on the question of his knowledge, but not controlling. More to the point was his familiarity with the internal workings, politics and procedures of General Motors with respect to the granting or withholding of Chevrolet franchises.

As a matter of fact, however, Harvey's influence extended beyond the boundaries of Motors Holding. He himself testified that he could "influence" the granting or withholding of a franchise. The Hicks brothers recognized and Harvey acknowledged this ability on his part when in their meeting of October 4, 1974, they had asked Harvey if he would "blackball" them—or to use Harvey's language, "adversely influence" the granting of a General Motors franchise to them. And Broome, when it developed that Hicks Brothers had at some level been approved to take over the Debacker dealership, had told plaintiff Gerich not to worry, that Harvey would "stop it in Detroit". We are not talking here about formal authority to grant franchises. Formal authority to grant Chevrolet franchises was vested in the Chevrolet car division. We are talking about the way the matter actually worked in practice.

Plaintiff saw a demonstration of Harvey's influence. Harvey was able to induce Chevrolet to accept plaintiff Gerich as a dealer with one-third the personal investment Chevrolet usually required from the dealer. The policy was to require a personal investment from the dealer of at least 25% which in this case would have been $150,000. Gerich was approved with a personal investment of 8.3%.

But Harvey's life-or-death power over the granting or withholding of a Chevrolet franchise is not the issue; plaintiff could reasonably suppose that he was in a position at least to evaluate Hicks Brothers' prospects for getting a General Motors franchise. Gerich could suppose that Harvey knew what he was talking about when he said that Hicks Brothers would never get another GM franchise.

This combination of knowledge on Harvey's part and his ability to influence, could reasonably have been viewed by the jury as justifying plaintiff's reliance upon his representation.

*Materiality to plaintiff.*

Appellant says the representation was not a material one in inducing the plaintiff to enter into the ill-fated venture. The jury could have found that it was a material factor. That he placed a value upon freedom from competition from the Hicks brothers would be hard to gainsay, if his testimony is to be believed. At the time for negotiating the option, he inquired whether a "non-compete" clause should be included. Broome said it would not be required, for Hicks Brothers would not get another GM franchise. This statement confirmed what Harvey had said in their Detroit conference on November 11. At that conference he had made specific inquiry what the Hicks brothers were going to do. "I wanted to know who my competition would be," Gerich said. The $150,000 price was several times referred to in the evidence as being for "fixed assets and good will". A seller's good will is of little value to the buyer if the seller goes immediately into business in the same market with the same product.

Defendant says Gerich should have been alerted when Bill Hicks mentioned a Buick-Pontiac agency they were considering. But that is not necessarily so, for Gerich could have believed that they would be disappointed when they made application to GM for the franchise—but, however that might be, Hicks Brothers in a Buick-Pontiac agency would be a different thing than Hicks Brothers in a Chevrolet agency, the line with which they had been connected and with which their good will was connected through seven or eight years of operating a Chevrolet agency.

*Damages to plaintiff.*

Defendant next calls upon the rule of *Toenjes v. L. J. NcNeary Construction Company,* 406 S.W.2d 101, 106 (Mo.App.1966), which holds that "proof of substantial injury and damage is essential to recover in an action for fraud and deceit", and that "in contradistinction with trespass and other direct injuries for which the complainant is awarded nominal damages if he should fail to plead and prove actual damage, deceit belongs to that class of tort of which pecuniary loss constitutes a part of the cause of action".

Under this topic defendant raises no question about the measure of damages, either in the admission or rejection of evidence, or in the jury instructions on the subject. It does not challenge the amount of the verdict for excessiveness. We do not need to deal with those questions. Our question as presented by defendant's motion for a directed verdict, and by its brief, is whether plaintiff's evidence showed substantial, as opposed to nominal, damages so as to make out a prima facie case.

We conclude that the jury could reasonably have found from the evidence that plaintiff suffered substantial damage stemming from Hicks Brothers' reentering the Chevrolet dealership (which both parties, and we, treat as resulting from defendant's misrepresentation that Hicks Brothers would not get another General Motors franchise). Plaintiff's evidence therefore supplies that element of his case.

The evidence shows that Hicks Brothers took Farmland Industries, the agency's largest fleet customer, and Budget Rent-A-Car, another large fleet buyer.

Two key employees, and three other experienced and valued employees, quit plaintiff and immediately or soon joined Hicks Brothers at the new location.

Plaintiff Gerich testified that in the month of June when advertisements of the new Hicks Brothers' dealership began to appear, "the volume at Milan Chevrolet and the business, new, used, dropped off tremendously . . . We didn't have anybody coming in the showroom or the used car lot."

That defendant suffered substantial pecuniary loss is plain. There is no well-marked evidentiary trail leading from the loss back to the prompt reentry of Hicks Brothers into the Chevrolet market, but that does not defeat plaintiff. In the nature of the case, it would be impossibly cumbersome to collect and adduce such proof. But there is enough here from which the jury, made up of men and women of varying degrees of worldly experience and wisdom, could trace to the Hicks Brothers competition a substantial portion of plaintiff's loss.

It is true, as defendant argues, that other factors may have contributed to plaintiff's loss. Defendant points out that after the first month after Hicks Brothers reentered business, plaintiff's business showed the smallest loss of any of the three months he had operated it—$11,897 as against $13,980 and $13,160.79. The July loss was only $750.48. But by the end of August the accumulated loss had grown to $83,098.75. Defendant attributes the losses to poor management on plaintiff's part and to adverse economic conditions in the automobile business. Pertinent to this argument is the following language from *Herod v. St. Louis, San Francisco Ry. Co.,* 299 S.W. 74, 78 (Mo. App.1927):

"In an action for tort, where the evidence clearly shows substantial damages for which the defendant is responsible, plaintiff is not confined to a recovery of

mere nominal damages by a failure to show with exactness the portion of the damages for which the defendant is responsible. Where it is impossible to distinguish between the damage arising from the actionable injury and the damage which has another origin, the jury are left to make from the evidence the best estimate in their power and to award compensatory damages for the actionable injury. And in case of concurring torts by several, the difficulty of ascertaining with exactness the proportion of damage caused by each tort-feasor is not a ground for denying the right to recover a substantial sum, where the best evidence of which the case is susceptible, reasonably tending to show the relative proportion, is adduced."

It must be agreed that the amount of the loss which directly resulted from Hicks Brothers competition does not admit of precise ascertainment. But in such cases, the plaintiff is not to be denied recovery for defendant's wrong because of the difficulty or the impossibility of quantifying the damages.

"It is always incumbent upon the party who asserts he has been damaged to adduce proof of the elements of his damage, but the rule against the recovery of uncertain damages relates to uncertainty as to the cause rather than uncertainty as to the measure or extent." *Thayer-Moore Brokerage Co. v. Campbell*, 164 Mo.App. 8, 147 S.W. 545, 550 (1912).

*See* Annot., "Damages for breach by seller or former employee of covenant, express or implied, not to engage in like business or enter employment of competitor of covenantee," 127 A.L.R. 1152; Annot., "Distinction between uncertainty as to whether substantial damages resulted and uncertainty as to amount," 78 A.L.R. 858; 22 Am.Jur.2d *Damages*, § 24, 25 (1965).

*Conclusion.*

The parties in their briefs have examined the evidence microscopically. It is not feasible for us in this opinion to deal with it as minutely, nor is it necessary, since our limited task is to determine whether the evidence made a prima facie case for plaintiff. We have set out enough of the evidence to resolve that issue in the affirmative.

The judgment is affirmed.

All concur.